# JOHNSON *v.* LOUISIANA

No. 69–5035.   Argued March 1, 1971—Reargued January 10, 1972—
Decided May 22, 1972

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, and REHNQUIST, JJ., joined. BLACKMUN, J., *post,* p. 365, and POWELL, J., *post,* p. 366, filed concurring opinions. DOUGLAS, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post,* p. 380. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post,* p. 395. STEWART, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post,* p. 397. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post,* p. 399.

*Richard A. Buckley* reargued the cause and filed a brief for appellant.

*Louise Korns* reargued the cause for appellee. With her on the brief were *Jack P. F. Gremillion,* Attorney General of Louisiana, and *Jim Garrison.*

MR. JUSTICE WHITE delivered the opinion of the Court.

Under both the Louisiana Constitution and Code of Criminal Procedure, criminal cases in which the punishment is necessarily at hard labor are tried to a jury of 12, and the vote of nine jurors is sufficient to return either a guilty or not guilty verdict.[1] The principal question

---

[1] La. Const., Art. VII, § 41, provides:

"Section 41. The Legislature shall provide for the election and drawing of competent and intelligent jurors for the trial of civil and criminal cases; provided, however, that no woman shall be drawn for jury service unless she shall have previously filed with the clerk of the District Court a written declaration of her desire to be subject to such service. All cases in which the punishment may not be at hard labor shall, until otherwise provided by law, be tried by the judge without a jury. Cases, in which the punishment may be at

in this case is whether these provisions allowing less-than-unanimous verdicts in certain cases are valid under the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

## I

Appellant Johnson was arrested at his home on January 20, 1968. There was no arrest warrant, but the victim of an armed robbery had identified Johnson from photographs as having committed the crime. He was then identified at a lineup, at which he had counsel, by the victim of still another robbery. The latter crime is involved in this case. Johnson pleaded not guilty, was tried on May 14, 1968, by a 12-man jury and was convicted by a nine-to-three verdict. His due process and equal protection challenges to the Louisiana constitutional and statutory provisions were rejected by the Louisiana courts, 255 La. 314, 230 So. 2d 825 (1970), and he appealed here. We noted probable jurisdiction. 400 U. S. 900 (1970). Conceding that under *Duncan* v. *Louisiana,* 391 U. S. 145 (1968), the Sixth Amendment is not applicable to his case, see *DeStefano* v. *Woods,* 392 U. S. 631 (1968), appellant presses his equal protection

---

hard labor, shall be tried by a jury of five, all of whom must concur to render a verdict; cases, in which the punishment is necessarily at hard labor, by a jury of twelve, nine of whom must concur to render a verdict; cases in which the punishment may be capital, by a jury of twelve, all of whom must concur to render a verdict."

La. Code Crim. Proc., Art. 782, provides:

"Cases in which the punishment may be capital shall be tried by a jury of twelve jurors, all of whom must concur to render a verdict. Cases in which the punishment is necessarily at hard labor shall be tried by a jury composed of twelve jurors, nine of whom must concur to render a verdict. Cases in which the punishment may be imprisonment at hard labor, shall be tried by a jury composed of five jurors, all of whom must concur to render a verdict. Except as provided in Article 780, trial by jury may not be waived."

and due process claims, together with a Fourth Amendment claim also rejected by the Louisiana Supreme Court. We affirm.

## II

Appellant argues that in order to give substance to the reasonable-doubt standard, which the State, by virtue of the Due Process Clause of the Fourteenth Amendment, must satisfy in criminal cases, see *In re Winship*, 397 U. S. 358, 363–364 (1970), that clause must be construed to require a unanimous-jury verdict in all criminal cases. In so contending, appellant does not challenge the instructions in this case. Concededly, the jurors were told to convict only if convinced of guilt beyond a reasonable doubt. Nor is there any claim that, if the verdict in this case had been unanimous, the evidence would have been insufficient to support it. Appellant focuses instead on the fact that less than all jurors voted to convict and argues that, because three voted to acquit, the reasonable-doubt standard has not been satisfied and his conviction is therefore infirm.

We note at the outset that this Court has never held jury unanimity to be a requisite of due process of law. Indeed, the Court has more than once expressly said that "[i]n criminal cases due process of law is not denied by a state law . . . which dispenses with the necessity of a jury of twelve, or unanimity in the verdict." *Jordan* v. *Massachusetts*, 225 U. S. 167, 176 (1912) (dictum). Accord, *Maxwell* v. *Dow*, 176 U. S. 581, 602, 605 (1900) (dictum). These statements, moreover, co-existed with cases indicating that proof of guilt beyond a reasonable doubt is implicit in constitutions recognizing "the fundamental principles that are deemed essential for the protection of life and liberty." *Davis* v. *United States*, 160 U. S. 469, 488 (1895). See also *Leland* v. *Oregon*, 343 U. S. 790, 802–803 (1952) (dissenting opinion); *Brinegar*

v. *United States,* 338 U. S. 160, 174 (1949); *Coffin* v. *United States,* 156 U. S. 432, 453–460 (1895).[2]

Entirely apart from these cases, however, it is our view that the fact of three dissenting votes to acquit raises no question of constitutional substance about either the integrity or the accuracy of the majority verdict of guilt. Appellant's contrary argument breaks down into two parts, each of which we shall consider separately: first, that nine individual jurors will be unable to vote conscientiously in favor of guilt beyond a reasonable doubt when three of their colleagues are arguing for acquittal, and second, that guilt cannot be said to have been proved beyond a reasonable doubt when one or more of a jury's members at the conclusion of deliberation still possess such a doubt. Neither argument is persuasive.

Numerous cases have defined a reasonable doubt as one " 'based on reason which arises from the evidence or lack of evidence.' " *United States* v. *Johnson,* 343 F. 2d 5, 6 n. 1 (CA2 1965). Accord, *e. g., Bishop* v. *United States,* 71 App. D. C. 132, 138, 107 F. 2d 297, 303 (1939); *United States* v. *Schneiderman,* 106 F. Supp. 906, 927 (SD Cal. 1952); *United States* v. *Haupt,* 47 F. Supp. 836, 840 (ND Ill. 1942), rev'd on other grounds, 136 F. 2d 661 (CA7 1943). In *Winship, supra,* the Court recognized this evidentiary standard as " 'impress[ing] on the trier of fact the necessity of reaching a subjective state of certitude of the facts in issue.' " 397 U. S., at 364 (citation omitted). In considering the first branch

---

[2] *Coffin* contains a lengthy discussion on the requirement of proof beyond a reasonable doubt and other similar standards of proof in ancient Hebrew, Greek, and Roman law, as well as in the common law of England. This discussion suggests that the Court of the late 19th century would have held the States bound by the reasonable-doubt standard under the Due Process Clause of the Fourteenth Amendment on the assumption that the standard was essential to a civilized system of criminal procedure. See generally *Duncan* v. *Louisiana,* 391 U. S. 145, 149–150, n. 14 (1968).

of appellant's argument, we can find no basis for holding that the nine jurors who voted for his conviction failed to follow their instructions concerning the need for proof beyond such a doubt or that the vote of any one of the nine failed to reflect an honest belief that guilt had been so proved. Appellant, in effect, asks us to assume that, when minority jurors express sincere doubts about guilt, their fellow jurors will nevertheless ignore them and vote to convict even if deliberation has not been exhausted and minority jurors have grounds for acquittal which, if pursued, might persuade members of the majority to acquit. But the mere fact that three jurors voted to acquit does not in itself demonstrate that, had the nine jurors of the majority attended further to reason and the evidence, all or one of them would have developed a reasonable doubt about guilt. We have no grounds for believing that majority jurors, aware of their responsibility and power over the liberty of the defendant, would simply refuse to listen to arguments presented to them in favor of acquittal, terminate discussion, and render a verdict. On the contrary it is far more likely that a juror presenting reasoned argument in favor of acquittal would either have his arguments answered or would carry enough other jurors with him to prevent conviction. A majority will cease discussion and outvote a minority only after reasoned discussion has ceased to have persuasive effect or to serve any other purpose—when a minority, that is, continues to insist upon acquittal without having persuasive reasons in support of its position. At that juncture there is no basis for denigrating the vote of so large a majority of the jury or for refusing to accept their decision as being, at least in their minds, beyond a reasonable doubt. Indeed, at this point, a "dissenting juror should consider whether his doubt was a reasonable one . . . [when it made] no impression upon the minds of so many

men, equally honest, equally intelligent with himself."
*Allen* v. *United States,* 164 U. S. 492, 501 (1896). Appellant offers no evidence that majority jurors simply ignore the reasonable doubts of their colleagues or otherwise act irresponsibly in casting their votes in favor of conviction, and before we alter our own longstanding perceptions about jury behavior and overturn a considered legislative judgment that unanimity is not essential to reasoned jury verdicts, we must have some basis for doing so other than unsupported assumptions.

We conclude, therefore, that, as to the nine jurors who voted to convict, the State satisfied its burden of proving guilt beyond any reasonable doubt. The remaining question under the Due Process Clause is whether the vote of three jurors for acquittal can be said to impeach the verdict of the other nine and to demonstrate that guilt was not in fact proved beyond such doubt. We hold that it cannot.

Of course, the State's proof could perhaps be regarded as more certain if it had convinced all 12 jurors instead of only nine; it would have been even more compelling if it had been required to convince and had, in fact, convinced 24 or 36 jurors. But the fact remains that nine jurors— a substantial majority of the jury—were convinced by the evidence. In our view disagreement of three jurors does not alone establish reasonable doubt, particularly when such a heavy majority of the jury, after having considered the dissenters' views, remains convinced of guilt. That rational men disagree is not in itself equivalent to a failure of proof by the State, nor does it indicate infidelity to the reasonable-doubt standard. Jury verdicts finding guilt beyond a reasonable doubt are regularly sustained even though the evidence was such that the jury would have been justified in having a reasonable doubt, see *United States* v. *Quarles,* 387 F. 2d 551, 554 (CA4 1967); *Bell* v. *United States,* 185 F. 2d 302, 310 (CA4 1950); even though the trial judge might not have

reached the same conclusion as the jury, see *Takahashi* v. *United States,* 143 F. 2d 118, 122 (CA9 1944); and even though appellate judges are closely divided on the issue whether there was sufficient evidence to support a conviction. See *United States* v. *Johnson,* 140 U. S. App. D. C. 54, 60, 433 F. 2d 1160, 1166 (1970); *United States* v. *Manuel-Baca,* 421 F. 2d 781, 783 (CA9 1970). That want of jury unanimity is not to be equated with the existence of a reasonable doubt emerges even more clearly from the fact that when a jury in a federal court, which operates under the unanimity rule and is instructed to acquit a defendant if it has a reasonable doubt about his guilt, see *Holt* v. *United States,* 218 U. S. 245, 253 (1910); *Agnew* v. *United States,* 165 U. S. 36, 51 (1897); W. Mathes & E. Devitt, Federal Jury Practice and Instructions § 8.01 (1965), cannot agree unanimously upon a verdict, the defendant is not acquitted, but is merely given a new trial. *Downum* v. *United States,* 372 U. S. 734, 736 (1963); *Dreyer* v. *Illinois,* 187 U. S. 71, 85–86 (1902); *United States* v. *Perez,* 9 Wheat. 579, 580 (1824). If the ' doubt of a minority of jurors indicates the existence of a reasonable doubt, it would appear that a defendant should receive a directed verdict of acquittal rather than a retrial. We conclude, therefore, that verdicts rendered by nine out of 12 jurors are not automatically invalidated by the disagreement of the dissenting three. Appellant was not deprived of due process of law.

### III

Appellant also attacks as violative of the Equal Protection Clause the provisions of Louisiana law requiring unanimous verdicts in capital and five-man jury cases, but permitting less-than-unanimous verdicts in cases such as his. We conclude, however, that the Louisiana statutory scheme serves a rational purpose and is not subject to constitutional challenge.

In order to "facilitate, expedite, and reduce expense in the administration of criminal justice," *State* v. *Lewis,* 129 La. 800, 804, 56 So. 893, 894 (1911), Louisiana has permitted less serious crimes to be tried by five jurors with unanimous verdicts, more serious crimes have required the assent of nine of 12 jurors, and for the most serious crimes a unanimous verdict of 12 jurors is stipulated. In appellant's case, nine jurors rather than five or 12 were required for a verdict. We discern nothing invidious in this classification. We have held that the States are free under the Federal Constitution to try defendants with juries of less than 12 men. *Williams* v. *Florida,* 399 U. S. 78 (1970). Three jurors here voted to acquit, but from what we have earlier said, this does not demonstrate that appellant was convicted on a lower standard of proof. To obtain a conviction in any of the categories under Louisiana law, the State must prove guilt beyond reasonable doubt, but the number of jurors who must be so convinced increases with the seriousness of the crime and the severity of the punishment that may be imposed. We perceive nothing unconstitutional or invidiously discriminatory, however, in a State's insisting that its burden of proof be carried with more jurors where more serious crimes or more severe punishments are at issue.

Appellant nevertheless insists that dispensing with unanimity in his case disadvantaged him as compared with those who commit less serious or capital crimes. With respect to the latter, he is correct; the State does make conviction more difficult by requiring the assent of all 12 jurors. Appellant might well have been ultimately acquitted had he committed a capital offense. But as we have indicated, this does not constitute a denial of equal protection of the law; the State may treat capital offenders differently without violating the constitutional rights of those charged with lesser crimes. As to the crimes triable by a five-man jury, if appel-

lant's position is that it is easier to convince nine of 12 jurors than to convince all of five, he is simply challenging the judgment of the Louisiana Legislature. That body obviously intended to vary the difficulty of proving guilt with the gravity of the offense and the severity of the punishment. We remain unconvinced by anything appellant has presented that this legislative judgment was defective in any constitutional sense.

## IV

Appellant also urges that his nighttime arrest without a warrant was unlawful in the absence of a valid excuse for failing to obtain a warrant and, further, that his subsequent lineup identification was a forbidden fruit of the claimed invasion of his Fourth Amendment rights. The validity of Johnson's arrest, however, is beside the point here, for it is clear that no evidence that might properly be characterized as the fruit of an illegal entry and arrest was used against him at his trial. Prior to the lineup, at which Johnson was represented by counsel, he was brought before a committing magistrate to advise him of his rights and set bail. At the time of the lineup, the detention of the appellant was under the authority of this commitment. Consequently, the lineup was conducted not by "exploitation" of the challenged arrest but "by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun* v. *United States,* 371 U. S. 471, 488 (1963).

The judgment of the Supreme Court of Louisiana is therefore

*Affirmed.*

Mr. Justice Blackmun, concurring.*

I join the Court's opinion and judgment in each of these cases. I add only the comment, which should be

---

*[This opinion applies also to No. 69–5046, *Apodaca et al.* v. *Oregon, post,* p. 404.]

obvious and should not need saying, that in so doing I do not imply that I regard a State's split-verdict system as a wise one. My vote means only that I cannot conclude that the system is constitutionally offensive. Were I a legislator, I would disfavor it as a matter of policy. Our task here, however, is not to pursue and strike down what happens to impress us as undesirable legislative policy.

I do not hesitate to say, either, that a system employing a 7–5 standard, rather than a 9–3 or 75% minimum, would afford me great difficulty. As MR. JUSTICE WHITE points out, *ante,* at 362, "a substantial majority of the jury" are to be convinced. That is all that is before us in each of these cases.

MR. JUSTICE POWELL, concurring in No. 69–5035 and concurring in the judgment in No. 69–5046.

I concur in the judgment of the Court that convictions based on less-than-unanimous jury verdicts in these cases did not deprive criminal defendants of due process of law under the Fourteenth Amendment. As my reasons for reaching this conclusion in the Oregon case differ from those expressed in the plurality opinion of MR. JUSTICE WHITE, I will state my views separately.

## I

### 69–5035

*Duncan* v. *Louisiana,* 391 U. S. 145 (1968), stands for the proposition that criminal defendants in state courts are entitled to trial by jury.[1] The source of that right is the Due Process Clause of the Fourteenth Amendment. Due process, as consistently interpreted by this Court, commands that citizens subjected to criminal

---

[1] That right, of course, is reserved for those crimes that may be deemed "serious." See *id.,* at 159–162; *Bloom* v. *Illinois,* 391 U. S. 194 (1968); *Baldwin* v. *New York,* 399 U. S. 66 (1970).

process in state courts be accorded those rights that are fundamental to a fair trial in the context of our "American scheme of justice." *Id.*, at 149. The right of an accused person to trial by a jury of his peers was a cherished element of the English common law long before the American Revolution. In this country, prior to *Duncan*, every State had adopted a criminal adjudicatory process calling for the extensive use of petit juries. *Id.*, at 150 n. 14; *Turner* v. *Louisiana*, 379 U. S. 466, 471 n. 9 (1965). Because it assures the interposition of an impartial assessment of one's peers between the defendant and his accusers, the right to trial by jury deservedly ranks as a fundamental of our system of jurisprudence. With this principle of due process, I am in full accord.

In *DeStefano* v. *Woods*, 392 U. S. 631 (1968), an Oregon petitioner sought to raise the question, left open in *Duncan*, whether the right to jury trial in a state court also contemplates the right to a unanimous verdict.[2] Because the Court concluded that *Duncan* was not to have retroactive applicability, it found it unnecessary to decide whether the Fourteenth Amendment requires unanimity. The trial in the case before the Court at that time occurred several years prior to May 20, 1968, the date of decision in *Duncan*. In the Louisiana case now before us, the petitioner also was convicted by a less-than-unanimous verdict before *Duncan* was decided. Accordingly, I read *DeStefano* as foreclosing consideration in this case of the question whether jury trial as guaranteed by the Due Process Clause contemplates a corollary requirement that its judgment be unanimous.

Indeed, in *Johnson* v. *Louisiana*, appellant concedes that the nonretroactivity of *Duncan* prevents him from raising his due process argument in the classic "fundamental fairness" language adopted there. Instead he

---

[2] This contention was raised in *Carcerano* v. *Gladden*, which was consolidated and disposed of along with the *DeStefano* opinion.

claims that he is deprived of due process because a conviction in which only nine of 12 jurors joined is not one premised on a finding of guilt beyond a reasonable doubt, held to be a requisite element of due process in *In re Winship*, 397 U. S. 358, 364 (1970). For the reasons stated in the majority opinion, I do not agree that Louisiana's less-than-unanimous verdict rule undercuts the applicable standard of proof in criminal prosecutions in that State.

Appellant also asks this Court to find a violation of the Equal Protection Clause in Louisiana's constitutional and statutory provisions establishing the contours of the jury trial right in that State. The challenged provisions divide those accused of crimes into three categories depending on the severity of the possible punishment: those charged with offenses for which the punishment might be at hard labor are entitled to a five-juror, unanimous verdict; those charged with offenses for which the punishment will necessarily be at hard labor are entitled to a verdict in which nine of 12 jurors must concur; and those charged with capital offenses are entitled to a 12-juror, unanimous verdict. La. Const., Art. VII, § 41; La. Code Crim. Proc., Art. 782. Such distinctions between classes of defendants do not constitute invidious discrimination against any one of the classes unless the State's classification can be said to lack a reasonable or rational basis. We have been shown no reason to question the rationality of Louisiana's tri-level system. I, therefore, join the Court's opinion in *Johnson* v. *Louisiana* affirming the decision below.[3]

---

[3] In addition to the jury trial issues in this case, I also join Part IV of the Court's opinion insofar as it concludes that the lineup identification was not the fruit of the prior warrantless arrest. *Wong Sun* v. *United States*, 371 U. S. 471 (1963). Under the circumstances of this case, I find it unnecessary to reach the question whether appellant's warrantless arrest was constitutionally invalid.

## II

### 69–5046

In the Oregon case decided today, *Apodaca* v. *Oregon,* the trials occurred after *Duncan* was decided. The question left unanswered in *Duncan* and *DeStefano* is therefore squarely presented. I concur in the plurality opinion in this case insofar as it concludes that a defendant in a state court may constitutionally be convicted by less than a unanimous verdict, but I am not in accord with a major premise upon which that judgment is based. Its premise is that the concept of jury trial, as applicable to the States under the Fourteenth Amendment, must be identical in every detail to the concept required in federal courts by the Sixth Amendment.[4] I do not think that all of the elements of jury trial within the meaning of the Sixth Amendment are necessarily embodied in or incorporated into the Due Process Clause of the Fourteenth Amendment. As Mr. Justice Fortas, concurring in *Duncan* v. *Louisiana,* 391 U. S., at 213, said:

> "Neither logic nor history nor the intent of the draftsmen of the Fourteenth Amendment can possibly be said to require that the Sixth Amendment or its jury trial provision be applied to the States together with the total gloss that this Court's decisions have supplied."

In an unbroken line of cases reaching back into the late 1800's, the Justices of this Court have recognized, virtually without dissent, that unanimity is one of the indispensable features of *federal* jury trial. *Andres* v. *United States,* 333 U. S. 740, 748–749 (1948); *Patton* v. *United States,* 281 U. S. 276, 288–290 (1930); *Hawaii*

---

[4] Jury trial in federal cases is also assured by Art. III, § 2, of the Constitution: "The Trial of all Crimes . . . shall be by Jury."

v. *Mankichi,* 190 U. S. 197, 211–212 (1903) (see also Mr. Justice Harlan's dissenting opinion); *Maxwell* v. *Dow,* 176 U. S. 581, 586 (1900) (see also Mr. Justice Harlan's dissenting opinion); *Thompson* v. *Utah,* 170 U. S. 343, 355 (1898).[5] In these cases, the Court has presumed that unanimous verdicts are essential in federal jury trials, not because unanimity is necessarily fundamental to the function performed by the jury, but because that result is mandated by history.[6] The reasoning that

---

[5] See also MR. JUSTICE WHITE's opinion for the Court in *Swain* v. *Alabama,* 380 U. S. 202, 211 (1965), stating, in dictum, that "Alabama adheres to the common-law system of trial by an impartial jury of 12 men who must unanimously agree on a verdict, *the system followed in the federal courts by virtue of the Sixth Amendment.*" (Emphasis supplied.)

The same result has been attained with respect to the right to jury trial in civil cases under the Seventh Amendment. See *American Publishing Co.* v. *Fisher,* 166 U. S. 464, 467–468 (1897); *Springville* v. *Thomas,* 166 U. S. 707 (1897).

[6] The process of determining the content of the Sixth Amendment right to jury trial has long been one of careful evaluation of, and strict adherence to the limitations on, that right as it was known in criminal trials at common law. See *Williams* v. *Florida,* 399 U. S. 78, 117, 122–129 (1970) (separate opinion of Harlan, J.).

A recent example of that process of constitutional adjudication may be found in Part II of the Court's opinion in *Duncan* v. *Louisiana,* 391 U. S., at 159–162, in which "petty" offenses were excluded from the rule requiring jury trial because such "offenses were tried without juries both in England and in the Colonies." The Court found "no substantial evidence that the Framers intended to depart from this established common-law practice." *Id.,* at 160. To the same effect, see Mr. Justice Harlan's dissent in *Baldwin* v. *New York* (appearing in *Williams* v. *Florida,* 399 U. S., at 119–121).

Also representative of this historical approach to the Sixth Amendment are the exhaustive majority and dissenting opinions in *Sparf* v. *United States,* 156 U. S. 51 (1895), in which the Court ultimately concluded that federal criminal juries were empowered only to decide questions of "fact." Rather than attempting to determine whether the fact-law distinction was desirable or whether it might be essential to the function performed by juries, the decision was premised on

runs throughout this Court's Sixth Amendment prece-
dents is that, in amending the Constitution to guarantee
the right to jury trial, the framers desired to preserve
the jury safeguard as it was known to them at common
law.[7] At the time the Bill of Rights was adopted, una-
nimity had long been established as one of the attributes
of a jury conviction at common law.[8] It therefore seems
to me, in accord both with history and precedent, that
the Sixth Amendment requires a unanimous jury verdict
to convict in a federal criminal trial.

But it is the Fourteenth Amendment, rather than the
Sixth, that imposes upon the States the requirement
that they provide jury trials to those accused of serious
crimes. This Court has said, in cases decided when the
intendment of that Amendment was not as clouded by
the passage of time, that due process does not require
that the States apply the federal jury-trial right with
all its gloss. In *Maxwell* v. *Dow,* 176 U. S., at 605, Mr.
Justice Peckham, speaking for eight of the nine members
of the Court, so stated:

"[W]hen providing in their constitution and legis-
lation for the manner in which civil or criminal ac-

the conclusion that English and Colonial juries had no right to
decide questions of law.

The same historical approach accounts for the numerous Supreme
Court opinions (see text accompanying n. 5), finding unanimity to
be one of the attributes subsumed under the term "jury trial." No
reason, other than the conference committee's revision of the House
draft of the Sixth Amendment, has been offered to justify departure
from this Court's prior precedents. The admitted ambiguity of that
piece of legislative history is not sufficient, in my view, to override
the unambiguous history of the common-law right. *Williams* v.
*Florida,* 399 U. S., at 123 n. 9.

[7] See, *e. g.,* R. Perry, Sources of Our Liberties 270, 281–282, 288,
429 (1959); 3 J. Story, Commentaries on the Constitution 652–653
(1st ed. 1833).

[8] See, *e. g.,* 4 W. Blackstone, Commentaries *376; W. Forsyth,
History of Trial By Jury 238–258 (1852); M. Hale, Analysis of the
Law of England 119 (1716).

tions shall be tried, it is in entire conformity with the character of the Federal Government that [the States] should have the right to decide for themselves what shall be the form and character of the procedure in such trials, . . . whether there shall be a jury of twelve or a lesser number, and whether the verdict must be unanimous or not. . . ."

Again, in *Jordan* v. *Massachusetts,* 225 U. S. 167, 176 (1912), the Court concluded that "[i]n criminal cases due process of law is not denied by a state law which dispenses with . . . the necessity of a jury of twelve, or unanimity in the verdict."

It is true, of course, that the *Maxwell* and *Jordan* Courts went further and concluded that the States might dispense with jury trial altogether. That conclusion, grounded on a more limited view of due process than has been accepted by this Court in recent years,[9] was rejected by the Court in *Duncan.* But I find nothing in the constitutional principle upon which *Duncan* is based, or in other precedents, that requires repudiation of the views expressed in *Maxwell* and *Jordan* with respect to the size of a jury and the unanimity of its verdict. Mr. Justice Fortas, concurring in *Duncan,* commented on the distinction between the requirements of the Sixth Amend-

---

[9] I agree with MR. JUSTICE WHITE's analysis in *Duncan* that the departure from earlier decisions was, in large measure, a product of a change in focus in the Court's approach to due process. No longer are questions regarding the constitutionality of particular criminal procedures resolved by focusing alone on the element in question and ascertaining whether a system of criminal justice might be imagined in which a fair trial could be afforded in the absence of that particular element. Rather, the focus is, as it should be, on the fundamentality of that element viewed in the context of the basic Anglo-American jurisprudential system common to the States. *Duncan* v. *Louisiana, supra,* at 149–150, n. 14. That approach to due process readily accounts both for the conclusion that jury trial *is* fundamental and that unanimity *is not.* See Part III, *infra.*

ment and those of the Due Process Clause and suggested the appropriate framework for analysis of the issue in this case.

> "I see no reason whatever . . . to assume that our decision today should require us to impose federal requirements such as unanimous verdicts or a jury of 12 upon the States. We may well conclude that these and other features of federal jury practice are by no means fundamental—that they are not essential to due process of law—and that they are not obligatory on the States." *Duncan* v. *Louisiana,* 391 U. S., at 213.

The question, therefore, that should be addressed in this case is whether unanimity is in fact so fundamental to the essentials of jury trial that this particular requirement of the Sixth Amendment is necessarily binding on the States under the Due Process Clause of the Fourteenth Amendment. An affirmative answer, ignoring the strong views previously expressed to the contrary by this Court in *Maxwell* and *Jordan,* would give unwarranted and unwise scope to the incorporation doctrine as it applies to the due process right of state criminal defendants to trial by jury.

The importance that our system attaches to trial by jury derives from the special confidence we repose in a "body of one's peers to determine guilt or innocence as a safeguard against arbitrary law enforcement." *Williams* v. *Florida,* 399 U. S. 78, 87 (1970). It is this safeguarding function, preferring the commonsense judgment of a jury as a bulwark "against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge," [10] that lies at the core of our dedication to the principles of jury determination of guilt or inno-

---

[10] *Duncan* v. *Louisiana,* 391 U. S., at 156. See also *Baldwin* v. *New York,* 399 U. S., at 72.

cence.[11]  This is the fundamental of jury trial that
brings it within the mandate of due process.  It seems
to me that this fundamental is adequately preserved by
the jury-verdict provision of the Oregon Constitution.
There is no reason to believe, on the basis of experience
in Oregon or elsewhere, that a unanimous decision of 12
jurors is more likely to serve the high purpose of jury
trial, or is entitled to greater respect in the community,
than the same decision joined in by 10 members of a
jury of 12.  The standard of due process assured by the
Oregon Constitution provides a sufficient guarantee that
the government will not be permitted to impose its judg-
ment on an accused without first meeting the full burden
of its prosecutorial duty.[12]

[11] Indeed, so strongly felt was the jury's role as the protector of
"innocence against the consequences of the partiality and undue
bias of judges in favor of the prosecution," that, at an earlier point
in this country's history, some of the States deemed juries the final
arbiters of all questions arising in criminal prosecutions, whether
factual or legal.  To allow judges to determine the law was con-
sidered by some States to pose too great a risk of judicial oppres-
sion, favoring the State above the accused.  See, e. g., State v.
Croteau, 23 Vt. 14, 21 (1849); Howe, Juries as Judges of Criminal
Law, 52 Harv. L. Rev. 582 (1939).  That historical preference for
jury decisionmaking is still reflected in the criminal procedures of
two States.  Ind. Const., Art. I, § 19; Md. Const., Art. XV, § 5.
See Brady v. Maryland, 373 U. S. 83 (1963); Wyley v. Warden,
372 F. 2d 742, 746 (CA4), cert. denied, 389 U. S. 863 (1967); Beavers
v. State, 236 Ind. 549, 141 N. E. 2d 118 (1957).

[12] The available empirical research indicates that the jury-trial
protection is not substantially affected by less-than-unanimous ver-
dict requirements.  H. Kalven and H. Zeisel, in their frequently cited
study of American juries (The American Jury (Phoenix ed. 1971)),
note that where unanimity is demanded 5.6% of the cases result in
hung juries.  Id., at 461.  Where unanimity is not required, avail-
able statistics indicate that juries will still be hung in over 3% of
the cases.  Thus, it may be estimated roughly that Oregon's prac-
tice may result in verdicts in some 2.5% more of the cases—cases in
which no verdict would be returned if unanimity were demanded.
Given the large number of causes to which this percentage disparity

Moreover, in holding that the Fourteenth Amendment has incorporated "jot-for-jot and case-for-case" [13] every element of the Sixth Amendment, the Court derogates principles of federalism that are basic to our system. In the name of uniform application of high standards of due process, the Court has embarked upon a course of constitutional interpretation that deprives the States of freedom to experiment with adjudicatory processes different from the federal model. At the same time, the Court's understandable unwillingness to impose requirements that it finds unnecessarily rigid (*e. g.*, *Williams* v. *Florida*, 399 U. S. 78), has culminated in the dilution of federal rights that were, until these decisions, never seriously questioned. The doubly undesirable consequence of this reasoning process, labeled by Mr. Justice Harlan as "constitutional schizophrenia," *id.*, at 136, may well be detrimental both to the state and federal criminal justice systems. Although it is perhaps late in the day for an expression of my views, I would have been in accord with the opinions in similar cases by THE CHIEF JUSTICE and Justices Harlan, STEWART, and Fortas [14] that, at least in defining the elements of the right to jury trial, there is no sound basis for interpreting the Fourteenth Amendment to require blind adherence by the States to all details of the federal Sixth Amendment standards.[15]

---

might be attributed, and given the possibility of conviction on retrial, it is impossible to conclude that this percentage represents convictions obtained under standards offensive to due process.

[13] *Duncan* v. *Louisiana, supra,* at 181 (Harlan, J., dissenting).

[14] *Id.,* at 173–183 (Harlan, J., dissenting); *Bloom* v. *Illinois*, 391 U. S., at 211 (Fortas, J., concurring); *Baldwin* v. *New York*, 399 U. S., at 76–77 (BURGER, C. J., dissenting); *Williams* v. *Florida*, 399 U. S., at 117, 143 (separate opinions of Harlan, J., and STEWART, J.). Cf. MR. JUSTICE DOUGLAS' concurring opinion in *Alexander* v. *Louisiana*, 405 U. S. 625, 637 n. 4 (1972).

[15] My unwillingness to accept the "incorporationist" notion that jury trial must be applied with total uniformity does not require

While the Civil War Amendments altered substantially the balance of federalism, it strains credulity to believe that they were intended to deprive the States of all freedom to experiment with variations in jury-trial procedure. In an age in which empirical study is increasingly relied upon as a foundation for decisionmaking, one of the more obvious merits of our federal system is the opportunity it affords each State, if its people so choose, to become a "laboratory" and to experiment with a range of trial and procedural alternatives. Although the need for the innovations that grow out of diversity has always been great, imagination unimpeded by unwarranted demands for national uniformity is of special importance at a time when serious doubt exists as to the adequacy of our criminal justice system. The same diversity of local legislative responsiveness that marked the development of economic and social reforms in this country,[16] if not barred by an unduly restrictive application of the Due Process Clause, might well lead to valuable innovations with respect to determining—fairly and more expeditiously—the guilt or innocence of the accused.

Viewing the unanimity controversy as one requiring a fresh look at the question of what is fundamental in jury trial, I see no constitutional infirmity in the provision adopted by the people of Oregon. It is the product of a constitutional amendment, approved by a vote of the people in the State, and appears to be patterned on a provision of the American Law Institute's Code of Crim-

that I take issue with every precedent of this Court applying various criminal procedural rights to the States with the same force that they are applied in federal courts. See Mr. Justice Fortas' opinion in *Bloom* v. *Illinois*, 391 U. S., at 214, which also applied to *Duncan*.

[16] See Mr. Justice Brandeis' oft-quoted dissent in *New State Ice Co.* v. *Liebmann*, 285 U. S. 262, 280, 309–311 (1932), in which he details the stultifying potential of the substantive due process doctrine.

inal Procedure.[17] A similar decision has been echoed more recently in England where the unanimity requirement was abandoned by statutory enactment.[18] Less-than-unanimous verdict provisions also have been viewed with approval by the American Bar Association's Criminal Justice Project.[19] Those who have studied the jury mechanism and recommended deviation from the historic rule of unanimity have found a number of considerations to be significant. Removal of the unanimity requirement could well minimize the potential for hung juries occasioned either by bribery or juror irrationality. Furthermore, the rule that juries must speak with a single voice often leads, not to full agreement among the 12 but to agreement by none and compromise by all, despite the frequent absence of a rational basis for such compromise.[20] Quite apart from whether Justices sitting on this Court would have deemed advisable the adoption of any particular less-than-unanimous jury provision, I think that considerations of this kind reflect a legitimate basis for experimentation and deviation from the federal blueprint.[21]

---

[17] ALI, Code of Criminal Procedure § 335 (1930).

[18] Criminal Justice Act 1967, c. 80, § 13 (Great Britain).

[19] American Bar Association, Project on Standards for Criminal Justice, Trial By Jury § 1.1 (Approved Draft 1968) (see also commentary, at 25–28).

[20] See, e. g., Kalven & Zeisel, The American Jury: Notes For an English Controversy, 48 Chi. B. Rec. 195 (1967); Samuels, Criminal Justice Act, 31 Mod. L. Rev. 16, 24–27 (1968); Comment, Waiver of Jury Unanimity—Some Doubts About Reasonable Doubt, 21 U. Chi. L. Rev. 438, 444–445 (1954); Comment, Should Jury Verdicts Be Unanimous in Criminal Cases?, 47 Ore. L. Rev. 417 (1968).

[21] See State v. Gann, 254 Ore. 549, 463 P. 2d 570 (1969).

Approval of Oregon's 10–2 requirement does not compel acceptance of all other majority-verdict alternatives. Due process and its mandate of basic fairness often require the drawing of difficult lines. See Francis v. Resweber, 329 U. S. 459, 466, 471 (1947)

## III

Petitioners in *Apodaca* v. *Oregon,* in addition to their primary contention that unanimity is a requirement of state jury trials because the Fourteenth Amendment "incorporates" the Sixth, also assert that Oregon's constitutional provision offends the federal constitutional guarantee against the systematic exclusion of any group within the citizenry from participating in the criminal trial process. While the systematic exclusion of identifiable minorities from jury service has long been recognized as a violation of the Equal Protection Clause (see, *e. g., Whitus* v. *Georgia,* 385 U. S. 545 (1967); *Strauder* v. *West Virginia,* 100 U. S. 303 (1880)), in more recent years the Court has held that criminal defendants are entitled, as a matter of due process, to a jury drawn from a representative cross section of the community. This is an essential element of a fair and impartial jury trial. See *Williams* v. *Florida,* 399 U. S., at 100; *Alexander* v. *Louisiana,* 405 U. S. 625, 634 (1972) (DOUGLAS, J., concurring). Petitioners contend that less-than-unanimous jury verdict provisions undercut that right by implicitly permitting in the jury room that which is prohibited in the jury venire selection process—the exclusion of minority group viewpoints. They argue that unless unanimity is required even of a properly drawn jury, the result—whether conviction or acquittal—may be the unjust product of racism, bigotry, or an emotionally inflamed trial.

Such fears materialize only when the jury's majority, responding to these extraneous pressures, ignores the evidence and the instructions of the court as well as the

---

(Frankfurter, J., concurring). Full recognition of the function performed by jury trials, coupled with due respect for the presumptive validity of state laws based on rational considerations such as those mentioned above, will assist in finding the required balance when the question is presented in a different context.

rational arguments of the minority. The risk, however, that a jury in a particular case will fail to meet its high responsibility is inherent in any system that commits decisions of guilt or innocence to untrained laymen drawn at random from the community. In part, at least, the majority-verdict rule must rely on the same principle that underlies our historic dedication to jury trial: both systems are premised on the conviction that each juror will faithfully perform his assigned duty. MR. JUSTICE DOUGLAS' dissent today appears to rest on the contrary assumption that the members of the jury constituting the majority have no *duty* to consider the minority's viewpoint in the course of deliberation. Characterizing the jury's consideration of minority views as mere "polite and academic conversation," or "courtesy dialogue," he concludes that a jury is under no obligation in Oregon to deliberate at all if 10 jurors vote together at the outset. *Post,* at 389. No such power freely to shut off competing views is implied in the record in this case and it is contrary to basic principles of jury participation in the criminal process. While there may be, of course, reasonable differences of opinion as to the merit of the speculative concerns expressed by these petitioners and reflected in the dissenting opinion, I find nothing in Oregon's experience to justify the apprehension that juries not bound by the unanimity rule will be more likely to ignore their historic responsibility.

Moreover, the States need not rely on the presumption of regularity in a vacuum since each has at its disposal protective devices to diminish significantly the prospect of jury irresponsibility. Even before the jury is sworn, substantial protection against the selection of a representative but wilfully irresponsible jury is assured by the wide availability of peremptory challenges and challenges for cause.[22] The likelihood of miscarriage of justice is

[22] See, *e. g., Swain* v. *Alabama,* 380 U. S. 202, 209–222 (1965).

further diminished by the judge's use of full jury instructions, detailing the applicable burdens of proof, informing the jurors of their duty to weigh the views of fellow jurors,[23] and reminding them of the solemn responsibility imposed by their oaths. Trial judges also retain the power to direct acquittals in cases in which the evidence of guilt is lacking, or to set aside verdicts once rendered when the evidence is insufficient to support a conviction. Furthermore, in cases in which public emotion runs high or pretrial publicity threatens a fair trial, judges possess broad power to grant changes of venue,[24] and to impose restrictions on the extent of press coverage.[25]

In light of such protections it is unlikely that the Oregon "ten-of-twelve" rule will account for an increase in the number of cases in which injustice will be occasioned by a biased or prejudiced jury. It may be wise to recall MR. JUSTICE WHITE's admonition in *Murphy* v. *Waterfront Comm'n,* 378 U. S. 52, 102 (1964), that the Constitution "protects against real dangers, not remote and speculative possibilities." Since I do not view Oregon's less-than-unanimous jury verdict requirement as violative of the due process guarantee of the Fourteenth Amendment, I concur in the Court's affirmance of these convictions.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL concur, dissenting.*

Appellant in the Louisiana case and petitioners in the Oregon case were convicted by juries that were less than unanimous. This procedure is authorized by both the

---

[23] *Allen* v. *United States,* 164 U. S. 492 (1896).

[24] See, *e. g., Irvin* v. *Dowd,* 366 U. S. 717 (1961).

[25] See, *e. g., Sheppard* v. *Maxwell,* 384 U. S. 333 (1966); *Estes* v. *Texas,* 381 U. S. 532 (1965).

*[This opinion applies also to No. 69–5046, *Apodaca et al.* v. *Oregon, post,* p. 404.]

Louisiana and Oregon Constitutions. Their claim, rejected by the majority, is that this procedure is a violation of their federal constitutional rights. With due respect to the majority, I dissent from this radical departure from American traditions.

I

The Constitution does not mention unanimous juries. Neither does it mention the presumption of innocence, nor does it say that guilt must be proved beyond a reasonable doubt in all criminal cases. Yet it is almost inconceivable that anyone would have questioned whether proof beyond a reasonable doubt was in fact the constitutional standard. And, indeed, when such a case finally arose we had little difficulty disposing of the issue. *In re Winship,* 397 U. S. 358, 364.

The Court, speaking through MR. JUSTICE BRENNAN, stated that:

"[The] use of the reasonable-doubt standard is indispensable to command the respect and confidence of the community in applications of the criminal law. It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned. It is also important in our free society that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with utmost certainty.

"Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Ibid.*

I had similarly assumed that there was no dispute that the Federal Constitution required a unanimous jury in all criminal cases. After all, it has long been explicit constitutional doctrine that the Seventh Amendment civil jury must be unanimous. See *American Publishing Co.* v. *Fisher*, 166 U. S. 464, where the Court said that "unanimity was one of the peculiar and essential features of trial by jury at the common law. No authorities are needed to sustain this proposition." *Id.,* at 468. Like proof beyond a reasonable doubt, the issue of unanimous juries in criminal cases simply never arose. Yet in cases dealing with juries it had always been assumed that a unanimous jury was required.[1] See *Maxwell* v. *Dow,* 176 U. S. 581, 586; *Patton* v. *United States,* 281 U. S. 276, 288; *Andres* v. *United States,* 333 U. S. 740,

---

[1] See also 2 J. Story, Commentaries on the Constitution 559 n. 2 (5th ed. 1891): "A trial by jury is generally understood to mean *ex vi termini,* a trial by a jury of *twelve* men, impartially selected, who must *unanimously* concur in the guilt of the accused before a legal conviction can be had. Any law, therefore, dispensing with any of these requisites, may be considered unconstitutional." In the 1969 Term we held a jury of six was sufficient, *Williams* v. *Florida,* 399 U. S. 78, but we noted that neither evidence nor theory suggested 12 was more favorable to the accused than six. The same cannot be said for unanimity and impartial selection of jurors. See *infra,* at 388–394.

Story's Commentaries cite no statutory authority for the requirement of unanimity in a criminal jury. That is because such authority has never been thought necessary. The unanimous jury has been so embedded in our legal history that no one would question its constitutional position and thus there was never any need to codify it. Indeed, no criminal case dealing with a unanimous jury has ever been decided by this Court before today, largely because of this unquestioned constitutional assumption. A similar assumption had, of course, been made with respect to the Seventh Amendment civil jury, but that issue did reach the Court. And the Court had no difficulty at all in holding a unanimous jury was a constitutional requirement. *American Publishing Co.* v. *Fisher,* 166 U. S. 464.

748. Today the bases of those cases are discarded and two centuries of American history are shunted aside.[2]

The result of today's decisions is anomalous: though unanimous jury decisions are not required in state trials, they are constitutionally required in federal prosecutions. How can that be possible when both decisions stem from the Sixth Amendment?

We held unanimously in 1948 that the Bill of Rights requires a unanimous jury verdict:

"Unanimity in jury verdicts is required where the Sixth and Seventh Amendments apply. In criminal cases this requirement of unanimity extends to all issues—character or degree of the crime, guilt and punishment—which are left to the jury. A verdict embodies in a single finding the conclusions by the jury upon all the questions submitted to it." *Andres* v. *United States,* 333 U. S., at 748.

After today's decisions, a man's property may only be taken away by a unanimous jury vote, yet he can be stripped of his liberty by a lesser standard. How can that result be squared with the law of the land as expressed in the settled and traditional requirements of procedural due process?

Rule 31 (a) of the Federal Rules of Criminal Procedure states, "The verdict shall be unanimous." That Rule was made by this Court with the concurrence of Congress pursuant to 18 U. S. C. § 3771. After today a unanimous verdict will be required in a federal prosecution but not in a state prosecution. Yet the source of the right in each case is the Sixth Amendment. I fail

---

[2] Of course, the unanimous jury's origin is long before the American Revolution. The first recorded case where there is a requirement of unanimity is *Anonymous Case,* 41 Lib. Assisarum 11 (1367), reprinted in English in R. Pound & T. Plucknett, Readings on the History and System of the Common Law 155–156 (3d ed. 1927).

to see how with reason we can maintain those inconsistent dual positions.

There have, of course, been advocates of the view that the duties imposed on the States by reason of the Bill of Rights operating through the Fourteenth Amendment are a watered-down version of those guarantees. But we held to the contrary in *Malloy* v. *Hogan,* 378 U. S. 1, 10–11:

> "We have held that the guarantees of the First Amendment, *Gitlow* v. *New York, supra; Cantwell* v. *Connecticut,* 310 U. S. 296; *Louisiana ex rel. Gremillion* v. *NAACP,* 366 U. S. 293, the prohibition of unreasonable searches and seizures of the Fourth Amendment, *Ker* v. *California,* 374 U. S. 23, and the right to counsel guaranteed by the Sixth Amendment, *Gideon* v. *Wainwright, supra,* are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment. In the coerced confession cases, involving the policies of the privilege itself, there has been no suggestion that a confession might be considered coerced if used in a federal but not a state tribunal. The Court thus has rejected the notion that the Fourteenth Amendment applies to the States only a 'watered-down, subjective version of the individual guarantees of the Bill of Rights.'"

*Malloy,* of course, not only applied the Self-Incrimination Clause to the States but also stands for the proposition, as mentioned, that "the same standards must determine whether an accused's silence in either a federal or state proceeding is justified." *Id.,* at 11. See also *Murphy* v. *Waterfront Comm'n,* 378 U. S. 52, 79. The equation of federal and state standards for the Self-Incrimination Clause was expressly reaffirmed in *Grif-*

*fin* v. *California,* 380 U. S. 609, 615; and in *Miranda* v. *Arizona,* 384 U. S. 436, 464.

Similarly, when the Confrontation Clause was finally made obligatory on the States, Mr. Justice Black for the majority was careful to observe that its guarantee, "like the right against compelled self-incrimination, is 'to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment.'" *Pointer* v. *Texas,* 380 U. S. 400, 406. Cf. *Dutton* v. *Evans,* 400 U. S. 74, 81.

Likewise, when we applied the Double Jeopardy Clause against the States Mr. Justice Marshall wrote for the Court that "[o]nce it is decided that a particular Bill of Rights guarantee is 'fundamental to the American scheme of justice,' *Duncan* v. *Louisiana* . . . the same constitutional standards apply against both the State and Federal Governments." *Benton* v. *Maryland,* 395 U. S. 784, 795. And, the doctrine of coextensive coverage was followed in holding the Speedy Trial Clause applicable to the States. *Klopfer* v. *North Carolina,* 386 U. S. 213, 222.

And, in *Duncan* v. *Louisiana,* 391 U. S. 145, 158 n. 30, in holding the jury trial guarantee binding in state trials, we noted that its prohibitions were to be identical against both the Federal and State Governments. See also *id.,* at 213 (Fortas, J., concurring).

Only once has this Court diverged from the doctrine of coextensive coverage of guarantees brought within the Fourteenth Amendment, and that aberration was later rectified. In *Wolf* v. *Colorado,* 338 U. S. 25, it was held that the Fourth Amendment ban against unreasonable and warrantless searches was enforceable against the States but the Court declined to incorporate the Fourth Amendment exclusionary rule of *Weeks* v. *United States,*

232 U. S. 383. Happily, however, that gap was partially closed in *Elkins* v. *United States,* 364 U. S. 206, and then completely bridged in *Mapp* v. *Ohio,* 367 U. S. 643. In *Mapp* we observed that "[t]his Court has not hesitated to enforce as strictly against the States as it does against the Federal Government the rights of free speech and of a free press, the rights to notice and to a fair, public trial . . . ." We concluded that "the same rule" should apply where the Fourth Amendment was concerned. *Id.,* at 656. And, later, we made clear that "the standard for obtaining a search warrant is . . . 'the same under the Fourth and Fourteenth Amendments,' " *Aguilar* v. *Texas,* 378 U. S. 108, 110; and that the "standard of reasonableness is the same under the Fourth and Fourteenth Amendments." *Ker* v. *California,* 374 U. S. 23, 33.

It is said, however, that the Sixth Amendment, as applied to the States by reason of the Fourteenth, does not mean what it does in federal proceedings, that it has a "due·process" gloss on it, and that that gloss gives the States power to experiment with the explicit or implied guarantees in the Bill of Rights.

Mr. Justice Holmes, dissenting in *Truax* v. *Corrigan,* 257 U. S. 312, 344, and Mr. Justice Brandeis, dissenting in *New State Ice Co.* v. *Liebmann,* 285 U. S. 262, 311, thought that the States should be allowed to improvise remedies for social and economic ills. But in that area there are not many "thou shalt nots" in the Constitution and Bill of Rights concerning property rights. The most conspicuous is the Just Compensation Clause of the Fifth Amendment. It has been held applicable with full vigor to the States by reason of the Fourteenth Amendment. *Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U. S. 226.

Do today's decisions mean that States may apply a "watered down" version of the Just Compensation

Clause? Or are today's decisions limited to a paring down of civil rights protected by the Bill of Rights and up until now as fully applicable to the States as to the Federal Government?

These civil rights—whether they concern speech, searches and seizures, self-incrimination, criminal prosecutions, bail, or cruel and unusual punishments extend, of course, to everyone, but in cold reality touch mostly the lower castes in our society. I refer, of course, to the blacks, the Chicanos, the one-mule farmers, the agricultural workers, the offbeat students, the victims of the ghetto. Are we giving the States the power to experiment in diluting their civil rights? It has long been thought that the "thou shalt nots" in the Constitution and Bill of Rights protect everyone against governmental intrusion or overreaching. The idea has been obnoxious that there are some who can be relegated to second-class citizenship. But if we construe the Bill of Rights and the Fourteenth Amendment to permit States to "experiment" with the basic rights of people, we open a veritable Pandora's box. For hate and prejudice are versatile forces that can degrade the constitutional scheme.[3]

---

[3] What was said of the impact of *Mapp* v. *Ohio,* 367 U. S. 643, on federalism bears repeating here:

"*Mapp* . . . established no assumption by this Court of supervisory authority over state courts . . . and, consequently, it implied no total obliteration of state laws relating to arrests and searches in favor of federal law. *Mapp* sounded no death knell for our federalism; rather, it echoed the sentiment of *Elkins* v. *United States* [, 364 U. S. 206,] that 'a healthy federalism depends upon the avoidance of needless conflict between state and federal courts' by itself urging that '[f]ederal-state cooperation . . . will be promoted, if only by recognition of their now mutual obligation to respect *the same fundamental criteria* in their approaches." *Ker* v. *California,* 374 U. S. 23, 31.

That, however, is only one of my concerns when we make the Bill of Rights, as applied to the States, a "watered down" version of what that charter guarantees. My chief concern is one often expressed by the late Mr. Justice Black, who was alarmed at the prospect of nine men appointed for life sitting as a super-legislative body to determine whether government has gone too far. The balancing was done when the Constitution and Bill of Rights were written and adopted. For this Court to determine, say, whether one person but not another is entitled to free speech is a power never granted it. But that is the ultimate reach of decisions that let the States, subject to our veto, experiment with rights guaranteed by the Bill of Rights.

I would construe the Sixth Amendment, when applicable to the States, precisely as I would when applied to the Federal Government.

## II

The plurality approves a procedure which diminishes the reliability of a jury. First, it eliminates the circumstances in which a minority of jurors (a) could have rationally persuaded the entire jury to acquit, or (b) while unable to persuade the majority to acquit, nonetheless could have convinced them to convict only on a lesser-included offense. Second, it permits prosecutors in Oregon and Louisiana to enjoy a conviction-acquittal ratio substantially greater than that ordinarily returned by unanimous juries.

The diminution of verdict reliability flows from the fact that nonunanimous juries need not debate and deliberate as fully as must unanimous juries. As soon as the requisite majority is attained, further consideration is not required either by Oregon or by Louisiana even though the dissident jurors might, if given the chance, be able to convince the majority. Such persua-

sion does in fact occasionally occur in States where the unanimous requirement applies: "In roughly one case in ten, the minority eventually succeeds in reversing an initial majority, and these may be cases of special importance." [4] One explanation for this phenomenon is that because jurors are often not permitted to take notes and because they have imperfect memories, the forensic process of forcing jurors to defend their conflicting recollections and conclusions flushes out many nuances which otherwise would go overlooked. This collective effort to piece together the puzzle of historical truth, however, is cut short as soon as the requisite majority is reached in Oregon and Louisiana. Indeed, if a necessary majority is immediately obtained, then no deliberation at all is required in these States. (There is a suggestion that this may have happened in the 10–2 verdict rendered in only 41 minutes in Apodaca's case.) To be sure, in jurisdictions other than these two States, initial majorities normally prevail in the end, but about a tenth of the time the rough-and-tumble of the jury room operates to reverse completely their preliminary perception of guilt or innocence. The Court now extracts from the jury room this automatic check against hasty fact-finding by relieving jurors of the duty to hear out fully the dissenters.

It is said that there is no evidence that majority jurors will refuse to listen to dissenters whose votes are unneeded for conviction. Yet human experience teaches that polite and academic conversation is no substitute for the earnest and robust argument necessary to reach unanimity. As mentioned earlier, in Apodaca's case, whatever courtesy dialogue transpired could not have lasted more than 41 minutes. I fail to under-

---

[4] H. Kalven & H. Zeisel, The American Jury 490 (1966). See also The American Jury: Notes For an English Controversy, 48 Chi. B. Rec. 195 (1967).

stand why the Court should lift from the States the burden of justifying so radical a departure from an accepted and applauded tradition and instead demand that these defendants document with empirical evidence what has always been thought to be too obvious for further study.

To be sure, in *Williams* v. *Florida,* 399 U. S. 78, we held that a State could provide a jury less than 12 in number in a criminal trial. We said: "What few experiments have occurred—usually in the civil area—indicate that there is no discernible difference between the results reached by the two different-sized juries. In short, neither currently available evidence nor theory suggests that the 12-man jury is necessarily more advantageous to the defendant than a jury composed of fewer members." *Id.,* at 101–102.

That rationale of *Williams* can have no application here. *Williams* requires that the change be neither more nor less advantageous to either the State or the defendant. It is said that such a showing is satisfied here since a 3:9 (Louisiana) or 2:10 (Oregon) verdict will result in acquittal. Yet experience shows that the less-than-unanimous jury overwhelmingly favors the States.

Moreover, even where an initial majority wins the dissent over to its side, the ultimate result in unanimous-jury States may nonetheless reflect the reservations of uncertain jurors. I refer to many compromise verdicts on lesser-included offenses and lesser sentences. Thus, even though a minority may not be forceful enough to carry the day, their doubts may nonetheless cause a majority to exercise caution. Obviously, however, in Oregon and Louisiana, dissident jurors will not have the opportunity through full deliberation to temper the opposing faction's degree of certainty of guilt.

The new rule also has an impact on cases in which a unanimous jury would have neither voted to acquit nor

to convict, but would have deadlocked. In unanimous-jury States, this occurs about 5.6% of the time. Of these deadlocked juries, Kalven and Zeisel say that 56% contain either one, two, or three dissenters. In these latter cases, the majorities favor the prosecution 44% (of the 56%) but the defendant only 12% (of the 56%).[5] Thus, by eliminating these deadlocks, Louisiana wins 44 cases for every 12 that it loses, obtaining in this band of outcomes a substantially more favorable conviction ratio (3.67 to 1) than the unanimous-jury ratio of slightly less than two guilty verdicts for every acquittal. H. Kalven & H. Zeisel, The American Jury 461, 488 (Table 139) (1966). By eliminating the one-and-two-dissenting-juror cases, Oregon does even better, gaining 4.25 convictions for every acquittal. While the statutes on their face deceptively appear to be neutral, the use of the nonunanimous jury stacks the truth-determining process against the accused. Thus, we take one step more away from the accusatorial system that has been our proud boast.

It is my belief that a unanimous jury is necessary if the great barricade known as proof beyond a reasonable

---

[5] The American Jury, *supra,* n. 3, at 460.

Last Vote of Deadlocked Juries

| Vote for Conviction | Per Cent |
|---|---|
| 11:1 | 24 |
| 10:2 | 10 |
| 9:3 | 10 |
| 8:4 | 6 |
| 7:5 | 13 |
| 6:6 | 13 |
| 5:7 | 8 |
| 4:8 | 4 |
| 3:9 | 4 |
| 2:10 | 8 |
| 1:11 | – |
| | 100% |

Number of Juries in Sample—48.

doubt is to be maintained. This is not to equate proof beyond a reasonable doubt with the requirement of a unanimous jury. That would be analytically fallacious since a deadlocked jury does not bar, as double jeopardy, retrial for the same offense. See *Dreyer* v. *Illinois*, 187 U. S. 71. Nevertheless, one is necessary for a proper effectuation of the other. Compare *Mapp* v. *Ohio*, 367 U. S. 643, with *Wolf* v. *Colorado*, 338 U. S. 25.

Suppose a jury begins with a substantial minority but then in the process of deliberation a sufficient number changes to reach the required 9:3 or 10:2 for a verdict. Is not there still a lingering doubt about that verdict? Is it not clear that the safeguard of unanimity operates in this context to make it far more likely that guilt is established beyond a reasonable doubt?

The late Learned Hand said that "as a litigant I should dread a lawsuit beyond almost anything else short of sickness and death." [6] At the criminal level that dread multiplies. Any person faced with the awesome power of government is in great jeopardy, even though innocent. Facts are always elusive and often two-faced. What may appear to one to imply guilt may carry no such overtones to another. Every criminal prosecution crosses treacherous ground, for guilt is common to all men. Yet the guilt of one may be irrelevant to the charge on which he is tried or indicate that if there is to be a penalty, it should be of an extremely light character.

The risk of loss of his liberty and the certainty that if found guilty he will be "stigmatized by the conviction" were factors we emphasized in *Winship* in sustaining the requirement that no man should be condemned where there is reasonable doubt about his guilt. 397 U. S., at 363–364.

---

[6] 3 Lectures on Legal Topics, Association of Bar of the City of New York 105 (1926).

We therefore have always held that in criminal cases we would err on the side of letting the guilty go free rather than sending the innocent to jail. We have required proof beyond a reasonable doubt as "concrete substance for the presumption of innocence." *Id.,* at 363.

That procedure has required a degree of patience on the part of the jurors, forcing them to deliberate in order to reach a unanimous verdict. Up until today the price has never seemed too high. Now a "law and order" judicial mood causes these barricades to be lowered.

The requirements of a unanimous jury verdict in criminal cases and proof beyond a reasonable doubt are so embedded in our constitutional law and touch so directly all the citizens and are such important barricades of liberty that if they are to be changed they should be introduced by constitutional amendment.

Today the Court approves a nine-to-three verdict. Would the Court relax the standard of reasonable doubt still further by resorting to eight-to-four verdicts, or even a majority rule? Moreover, in light of today's holdings and that of *Williams* v. *Florida,* in the future would it invalidate three-to-two or even two-to-one convictions?

Is the next step the elimination of the presumption of innocence? Mr. Justice Frankfurter, writing in dissent in *Leland* v. *Oregon,* 343 U. S. 790, 802–803, said:

"It is not unthinkable that failure to bring the guilty to book for a heinous crime which deeply stirs popular sentiment may lead the legislature of a State, in one of those emotional storms which on occasion sweep over our people, to enact that thereafter an indictment for murder, following attempted rape, should be presumptive proof of guilt and cast upon the defendant the burden of proving beyond a reasonable doubt that he did not do the killing. Can there be any doubt that such a statute would go beyond

394

the freedom of the States, under the Due Process
Clause of the Fourteenth Amendment, to fashion
their own penal codes and their own procedures for
enforcing them?  Why is that so?  Because from
the time that the law which we have inherited has
emerged from dark and barbaric times, the concep-
tion of justice which has dominated our criminal law
has refused to put an accused at the hazard of
punishment if he fails to remove every reasonable
doubt of his innocence in the minds of jurors.  It is
the duty of the Government to establish his guilt be-
yond a reasonable doubt.  This notion—basic in our
law and rightly one of the boasts of a free society—is
a requirement and a safeguard of due process of
law in the historic, procedural content of 'due proc-
ess.'  Accordingly there can be no doubt, I repeat,
that a State cannot cast upon an accused the duty
of establishing beyond a reasonable doubt that his
was not the act which caused the death of another."

The vast restructuring of American law which is en-
tailed in today's decisions is for political not for judicial
action.  Until the Constitution is rewritten, we have
the present one to support and construe.  It has served
us well.  We lifetime appointees, who sit here only by
happenstance, are the last who should sit as a Committee
of Revision on rights as basic as those involved in the
present cases.

Proof beyond a reasonable doubt and unanimity of
criminal verdicts and the presumption of innocence are
basic features of the accusatorial system.  What we do
today is not in that tradition but more in the tradition
of the inquisition.  Until amendments are adopted set-
ting new standards, I would let no man be fined or
imprisoned in derogation of what up to today was in-
disputably the law of the land.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL joins, dissenting.*

Readers of today's opinions may be understandably puzzled why convictions by 11–1 and 10–2 jury votes are affirmed in No. 69–5046, when a majority of the Court agrees that the Sixth Amendment requires a unanimous verdict in federal criminal jury trials, and a majority also agrees that the right to jury trial guaranteed by the Sixth Amendment is to be enforced against the States according to the same standards that protect that right against federal encroachment. The reason is that while my Brother POWELL agrees that a unanimous verdict is required in federal criminal trials, he does not agree that the Sixth Amendment right to a jury trial is to be applied in the same way to State and Federal Governments. In that circumstance, it is arguable that the affirmance of the convictions of Apodaca, Madden, and Cooper is not inconsistent with a view that today's decision in No. 69–5046 is a holding that only a unanimous verdict will afford the accused in a state criminal prosecution the jury trial guaranteed him by the Sixth Amendment. In any event, the affirmance must not obscure that the majority of the Court remains of the view that, as in the case of every specific of the Bill of Rights that extends to the States,† the Sixth Amendment's jury trial

---

*[This opinion applies also to No. 69–5046, *Apodaca* v. *Oregon*, *post*, p. 404.]

†See, for example, First Amendment, *Gitlow* v. *New York*, 268 U. S. 652 (1925); *Cantwell* v. *Connecticut*, 310 U. S. 296 (1940); *Louisiana ex rel. Gremillion* v. *NAACP*, 366 U. S. 293 (1961); Fourth Amendment, *Ker* v. *California*, 374 U. S. 23 (1963); Fifth Amendment's privilege against self-incrimination, *Malloy* v. *Hogan*, 378 U. S. 1 (1964); Fifth Amendment's Double Jeopardy Clause, *Benton* v. *Maryland*, 395 U. S. 784 (1969); Fifth Amendment's Just Compensation Clause, *Chicago, B. & Q. R. Co.* v. *Chicago*, 166 U. S. 226 (1897); Sixth Amendment's Speedy Trial Clause, *Klopfer* v. *North*

guarantee, however it is to be construed, has identical application against both State and Federal Governments.

I can add only a few words to the opinions of my Brothers DOUGLAS, STEWART, and MARSHALL, which I have joined. Emotions may run high at criminal trials. Although we can fairly demand that jurors be neutral until they have begun to hear evidence, it would surpass our power to command that they remain unmoved by the evidence that unfolds before them. What this means is that jurors will often enter the jury deliberations with strong opinions on the merits of the case. If at that time a sufficient majority is available to reach a verdict, those jurors in the majority will have nothing but their own common sense to restrain them from returning a verdict before they have fairly considered the positions of jurors who would reach a different conclusion. Even giving all reasonable leeway to legislative judgment in such matters, I think it simply ignores reality to imagine that most jurors in these circumstances would or even could fairly weigh the arguments opposing their position.

It is in this context that we must view the constitutional requirement that all juries be drawn from an accurate cross section of the community. When verdicts must be unanimous, no member of the jury may be ignored by the others. When less than unanimity is sufficient, consideration of minority views may become nothing more than a matter of majority grace. In my opinion, the right of all groups in this Nation to participate in the criminal process means the right to have their voices heard. A unanimous verdict vindicates that right. Majority verdicts could destroy it.

---

*Carolina,* 386 U. S. 213 (1967); Sixth Amendment's guarantee of jury trial, *Duncan* v. *Louisiana,* 391 U. S. 145 (1968); Sixth Amendment's Confrontation Clause, *Pointer* v. *Texas,* 380 U. S. 400 (1965).

MR. JUSTICE STEWART, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, dissenting.

This case was tried before the announcement of our decision in *Duncan* v. *Louisiana,* 391 U. S. 145. Therefore, unlike *Apodaca* v. *Oregon,* decided today, *post,* p. 404, the Sixth Amendment's guarantee of trial by jury is not applicable here. *DeStefano* v. *Woods,* 392 U. S. 631. But I think the Fourteenth Amendment alone clearly requires that if a State purports to accord the right of trial by jury in a criminal case, then only a unanimous jury can return a constitutionally valid verdict.

The guarantee against systematic discrimination in the selection of criminal court juries is a fundamental of the Fourteenth Amendment. That has been the insistent message of this Court in a line of decisions extending over nearly a century. *E. g., Carter* v. *Jury Comm'n,* 396 U. S. 320 (1970); *Whitus* v. *Georgia,* 385 U. S. 545 (1967); *Hernandez* v. *Texas,* 347 U. S. 475 (1954); *Patton* v. *Mississippi,* 332 U. S. 463 (1947); *Norris* v. *Alabama,* 294 U. S. 587 (1935); *Carter* v. *Texas,* 177 U. S. 442 (1900); *Strauder* v. *West Virginia,* 100 U. S. 303 (1880). The clear purpose of these decisions has been to ensure universal participation of the citizenry in the administration of criminal justice. Yet today's judgment approves the elimination of the one rule that can ensure that such participation will be meaningful—the rule requiring the assent of all jurors before a verdict of conviction or acquittal can be returned. Under today's judgment, nine jurors can simply ignore the views of their fellow panel members of a different race or class.*

The constitutional guarantee of an impartial system of

---

*And, notwithstanding MR. JUSTICE BLACKMUN's disclaimer, there is nothing in the reasoning of the Court's opinion that would stop it from approving verdicts by 8–4 or even 7–5.

jury selection in a state criminal trial rests on the Due Process and Equal Protection Clauses of the Fourteenth Amendment. See, *e. g., Whitus* v. *Georgia, supra,* at 549–550; *Carter* v. *Texas, supra,* at 447; *Strauder* v. *West Virginia, supra,* at 310. Only a jury so selected can assure both a fair criminal trial, see *id.,* at 308–309, and public confidence in its result, cf. *Witherspoon* v. *Illinois,* 391 U. S. 510, 519–520; *In re Winship,* 397 U. S. 358, 364. Today's decision grossly undermines those basic assurances. For only a unanimous jury so selected can serve to minimize the potential bigotry of those who might convict on inadequate evidence, or acquit when evidence of guilt was clear. See *Strauder* v. *West Virginia, supra,* at 309. And community confidence in the administration of criminal justice cannot but be corroded under a system in which a defendant who is conspicuously identified with a particular group can be acquitted or convicted by a jury split along group lines. The requirements of unanimity and impartial selection thus complement each other in ensuring the fair performance of the vital functions of a criminal court jury.

It does not denigrate the system of trial by jury to acknowledge that it is imperfect, nor does it ennoble that system to drape upon a jury majority the mantle of presumptive reasonableness in all circumstances. The Court has never before been so impervious to reality in this area. Its recognition of the serious risks of jury misbehavior is a theme unifying a series of constitutional decisions that may be in jeopardy if today's facile presumption of regularity becomes the new point of departure. Why, if juries do not sometimes act out of passion and prejudice, does the Constitution require the availability of a change of venue? Cf. *Groppi* v. *Wisconsin,* 400 U. S. 505; *Irvin* v. *Dowd,* 366 U. S. 717; *Strauder* v. *West Virginia, supra,* at 309. Why, if juries

do not sometimes act improperly, does the Constitution require protection from inflammatory press coverage and *ex parte* influence by court officers? Cf., *e. g., Sheppard* v. *Maxwell,* 384 U. S. 333; *Parker* v. *Gladden,* 385 U. S. 363; *Turner* v. *Louisiana,* 379 U. S. 466. Why, if juries must be presumed to obey all instructions from the bench, does the Constitution require that certain information must not go to the jury no matter how strong a cautionary charge accompanies it? Cf., *e. g., Bruton* v. *United States,* 391 U. S. 123; *Jackson* v. *Denno,* 378 U. S. 368. Why, indeed, should we insist that no man can be constitutionally convicted by a jury from which members of an identifiable group to which he belongs have been systematically excluded? Cf., *e. g., Hernandez* v. *Texas,* 347 U. S. 475.

So deeply engrained is the law's tradition of refusal to engage in after-the-fact review of jury deliberations, however, that these and other safeguards provide no more than limited protection. The requirement that the verdict of the jury be unanimous, surely as important as these other constitutional requisites, preserves the jury's function in linking law with contemporary society. It provides the simple and effective method endorsed by centuries of experience and history to combat the injuries to the fair administration of justice that can be inflicted by community passion and prejudice.

I dissent.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, dissenting.*

Today the Court cuts the heart out of two of the most important and inseparable safeguards the Bill of Rights offers a criminal defendant: the right to submit his case to a jury, and the right to proof beyond a reasonable

---

*[This opinion applies also to No. 69–5046, *Apodaca* v. *Oregon, post,* p. 404.]

doubt. Together, these safeguards occupy a fundamental place in our constitutional scheme, protecting the individual defendant from the awesome power of the State. After today, the skeleton of these safeguards remains, but the Court strips them of life and of meaning. I cannot refrain from adding my protest to that of my Brothers DOUGLAS, BRENNAN, and STEWART, whom I join.

In *Apodaca* v. *Oregon,* the question is too frighteningly simple to bear much discussion. We are asked to decide what is the nature of the "jury" that is guaranteed by the Sixth Amendment. I would have thought that history provided the appropriate guide, and as MR. JUSTICE POWELL has demonstrated so convincingly, history compels the decision that unanimity is an essential feature of that jury. But the majority has embarked on a "functional" analysis of the jury that allows it to strip away, one by one, virtually all the characteristic features of the jury as we know it. Two years ago, over my dissent, the Court discarded as an essential feature the traditional size of the jury. *Williams* v. *Florida,* 399 U. S. 78 (1970). Today the Court discards, at least in state trials, the traditional requirement of unanimity. It seems utterly and ominously clear that so long as the tribunal bears the label "jury," it will meet Sixth Amendment requirements as they are presently viewed by this Court. The Court seems to require only that jurors be laymen, drawn from the community without systematic exclusion of any group, who exercise common-sense judgment.

More distressing still than the Court's treatment of the right to jury trial is the cavalier treatment the Court gives to proof beyond a reasonable doubt. The Court asserts that when a jury votes nine to three for conviction, the doubts of the three do not impeach the verdict of the nine. The argument seems to be that since, under

*Williams,* nine jurors are enough to convict, the three dissenters are mere surplusage. But there is all the difference in the world between three jurors who are not there, and three jurors who entertain doubts after hearing all the evidence. In the first case we can never know, and it is senseless to ask, whether the prosecutor might have persuaded additional jurors had they been present. But in the second case we know what has happened: the prosecutor has tried and failed to persuade those jurors of the defendant's guilt. In such circumstances, it does violence to language and to logic to say that the government has proved the defendant's guilt beyond a reasonable doubt.

It is said that this argument is fallacious because a deadlocked jury does not, under our law, bring about an acquittal or bar a retrial. The argument seems to be that if the doubt of a dissenting juror were the "reasonable doubt" that constitutionally bars conviction, then it would necessarily result in an acquittal and bar retrial. But that argument rests on a complete *non sequitur.* The reasonable-doubt rule, properly viewed, simply establishes that, as a prerequisite to obtaining a valid conviction, the prosecutor must overcome all of the jury's reasonable doubts; it does not, of itself, determine what shall happen if he fails to do so. That is a question to be answered with reference to a wholly different constitutional provision, the Fifth Amendment ban on double jeopardy, made applicable to the States through the Due Process Clause of the Fourteenth Amendment in *Benton* v. *Maryland,* 395 U. S. 784 (1969).

Under prevailing notions of double jeopardy, if a jury has tried and failed to reach a unanimous verdict, a new trial may be held. *United States* v. *Perez,* 9 Wheat. 579 (1824). The State is free, consistent with the ban on double jeopardy, to treat the verdict of a nonunanimous jury as a nullity rather than as an

acquittal. On retrial, the prosecutor may be given the opportunity to make a stronger case if he can: new evidence may be available, old evidence may have disappeared, and even the same evidence may appear in a different light if, for example, the demeanor of witnesses is different. Because the second trial may vary substantially from the first, the doubts of the dissenting jurors at the first trial do not necessarily impeach the verdict of a new jury on retrial. But that conclusion is wholly consistent with the view that the doubts of dissenting jurors create a constitutional bar to conviction at the trial that produced those doubts. Until today, I had thought that was the law.

I respectfully reject the suggestion of my Brother POWELL that the doubts of minority jurors may be attributable to "irrationality" against which some protection is needed. For if the jury has been selected properly, and every juror is a competent and rational person, then the "irrationality" that enters into the deliberation process is precisely the essence of the right to a jury trial. Each time this Court has approved a change in the familiar characteristics of the jury, we have reaffirmed the principle that its fundamental characteristic is its capacity to render a commonsense, layman's judgment, as a representative body drawn from the community. To fence out a dissenting juror fences out a voice from the community, and undermines the principle on which our whole notion of the jury now rests. My dissenting Brothers have pointed to the danger, under a less-than-unanimous rule, of excluding from the process members of minority groups, whose participation we have elsewhere recognized as a constitutional requirement. It should be emphasized, however, that the fencing-out problem goes beyond the problem of identifiable minority groups. The juror whose dissenting voice is unheard

may be a spokesman, not for any minority viewpoint, but simply for himself—and that, in my view, is enough. The doubts of a single juror are in my view evidence that the government has failed to carry its burden of proving guilt beyond a reasonable doubt. I dissent.