# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 11-720


STATE OF LOUISIANA

VERSUS

ROBERT W. BELL


**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 8208-08
HONORABLE DAVID KENT SAVOIE, DISTRICT JUDGE

**********

### SHANNON J. GREMILLION
### JUDGE

**********

Court composed of Jimmie C. Peters, Marc T. Amy, and Shannon J. Gremillion, Judges.


**AFFIRMED.**


**John F. DeRosier**
**District Attorney, Fourteenth Judicial District Court**
**P. O. Box 3206**
**Lake Charles, LA 70602-3206**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Carla S. Sigler**
**Karen C. McLellan**
**Alberto Dupuy**
**Assistant District Attorneys, Fourteenth Judicial District Court**
**P. O. Box 3206**
**Lake Charles, LA 70602**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Edward King Alexander, Jr.**
**Calcasieu District Defender**
**P. O. Box 3757**
**Lake Charles, LA 70602**
**(337) 436-1718**
**COUNSEL FOR DEFENDANT/APPELLANT:**
**Robert W. Bell**

**GREMILLION, Judge.**

Defendant, Robert W. Bell, was indicted by a grand jury on March 6, 2008, for aggravated rape, a violation of La.R.S. 14:42, and sexual battery, a violation of La.R.S. 14:43.1. The indictment alleged Defendant engaged in oral sexual intercourse with H.N., a juvenile born March 16, 1994, and made H.N. touch his penis with her hand during a period of time from January 1, 1997, to December 31, 2003.[1] Defendant filed a motion for discovery and inspection and two motions for bill of particulars on May 2, 2008. The State filed a motion for production of physical evidence on May 22, 2008. The trial court granted the State's motion on June 10, 2008, and ordered Defendant to "provide all physical evidence of photographs of his penis to the State of Louisiana for comparison through Calcasieu Parish Sheriff's Office on June 11, 2008." Photographs of Defendant's penis were taken on June 11, 2008, by Corporal Tim Soileau.

The State responded to Defendant's motion for bill of particulars on June 18, 2008, by furnishing a copy of the indictment and by responding, "The answers can be obtained by reading the Discovery materials." The State objected to furnishing a further response.

The jury found Defendant not guilty on the first count of aggravated rape and guilty of attempted sexual battery as a responsive verdict on the second count. He was sentenced to five years at hard labor with credit for time served. Defendant filed a motion in arrest of judgment, a motion for judgment of acquittal, and a motion for new trial, which were denied. He alleges eight assignments of error on appeal. We affirm.

---

[1]Initials of the victim are used throughout to protect her identity pursuant to La.R.S. 46:1844(W).

**FACTS**

H.N. was sixteen years old at the time of trial. She had never seen or lived with her biological father. H.N. has three brothers, two older and one younger than she. In 1997, H.N. was three years old, and Defendant was her stepfather.

At trial, H.N. testified Defendant made her "touch him in bad ways whenever [she] was a little girl." The first time occurred when H.N. was three or four years old. She peeked in the bathroom door, and Defendant told her to come in. His pants were down, and "he had [her] feel him . . . with [her] hand." She touched his penis with her hand. The touching always occurred in the bathroom when her two older brothers were at school and her mother was at work.

When H.N. touched Defendant's penis, she noticed "a bump" on it; Defendant told her "he swallowed a banana Runt [candy], and it got stuck." His penis felt "kind of hard, kind of squishy . . . the same at one time." Defendant would tell H.N. "to try and hang on it." Defendant continued to make H.N. touch his penis until she was around eight or nine years old.

On one occasion, Defendant "grabbed a rag and then he said he needed to clean [her]. And he brought me to momma's room and laid me down and put his hand down there. And the rag, it wasn't the rag . . . . Because it was warm and slimy and a rag is rough." She recalled seeing the rag on his hand, and she did not look down. This incident occurred before H.N. started attending school.

H.N. said she told Defendant she wanted to tell someone about what happened to her. Defendant "told [her] to tell . . . over and over again," but she never did until she told her friend, Brittany Campbell, around age thirteen. H.N. also told Brittany's sister, Brooke; she asked them not to tell anyone because she "was scared."

2

When H.N.'s mother first questioned her about whether Defendant had done anything to her, she told her no "because [she] didn't want them to know." H.N. and her mother went to the sheriff's office the day after H.N. "talked to her about everything," and over the next couple of days H.N. told them things she remembered as she "would get nerve enough where [she] was able to tell them—tell her." She told how she would wake up and Defendant "would have a porno in; and he would have [her] sit down and watch it with him," how Defendant "would tell [her] to go get a knife, and he said that it was too big and he needed to cut it off now," and "how [they] used to take showers together."

At trial, H.N. explained she used pictures of a girl and a man at the child advocacy interview to show what happened to her. She circled the vagina "because he licked me down there," and she circled the hands because he touched her with them. On the picture of a man, she circled the penis "[b]ecause he made [her] touch him there," and she circled the mouth "[b]ecause he touched [her] with that."

H.N. testified she told the truth at trial and did not lie to get back at Defendant, her stepfather, for anything. She did not tell her mother sooner "[b]ecause [she] was scared. [She] thought [she] was going to get in trouble. And [Defendant] was [her] dad. [She] didn't want him going anywhere."

Brittany Campbell was eighteen at the time she testified at trial. She had known H.N. since the third grade, and they were good friends. When Brittany was around age twelve or thirteen in the fifth grade, H.N. told her Defendant had made her watch dirty movies with him and made her touch him when she was younger. H.N. asked Brittany not to tell anyone, and Brittany told H.N. she should tell her mom when she was ready. Brittany did not believe H.N. would lie about something like this; when H.N. told Brittany, "She was like crying . . . . She was

3

very upset. She didn't want to tell me at first." Brittany promised H.N. she would not say anything, but she encouraged H.N. to tell her mother. From her point of view, Brittany believed Defendant was a good man, based on how he treated her personally.

April Bell, Defendant's former wife and H.N.'s mother, testified that she met Defendant in July 1996. Defendant watched H.N. after school several times, and he moved into a trailer with April in August 1997. In January 1999, April began attending school, and Defendant took care of H.N. while April was in class. April and Defendant were married on May 12, 2000. Throughout 2001 and 2002, Defendant watched H.N. after school.

April's divorce from Defendant became final in October 2005. Their custody agreement involved visitation of their child together, but H.N. would also visit Defendant sometimes. Defendant and April reconciled around March 2006, and were together for about a year, and H.N. spent time with Defendant in 2007.

In January 2008, April's son asked H.N. if something had happened to her after a discussion of possible abuse involving H.N.'s younger half-brother. H.N. was eating, and she put her head down and burst into tears. April then asked her about exactly what happened; she called the sheriff's department and made an appointment for the next day.

Detective Michael Primeaux, of the Calcasieu Parish Sheriff's Office, received an arrest warrant for Defendant on January 24, 2008, and arranged for Defendant's arrest in Beauregard Parish. Detective Primeaux first asked Defendant how many times H.N. had touched his penis with her hand. Defendant said, "never, never happened, couldn't have happened, didn't happen." Detective Primeaux then asked Defendant "about the time when she had disclosed to [them] about the oral sex when he would wipe her with a rag." Defendant said "that

4

never happened, he the [sic] never did oral sex on her, never could have happened, didn't happen." Defendant also denied H.N. could have walked into the bathroom after he had taken a shower. Defendant did say he was urinating in the restroom on one occasion when H.N. walked in on him. He was able to turn away, and H.N. probably saw his penis for probably one to two seconds.

After Defendant denied the allegations, Detective Primeaux asked him how H.N. could know about a specific characteristic of his penis. Defendant then became very uncomfortable, pale, and "just almost deflated." He mentioned for the first time he had been sick with pneumonia. Defendant began to talk about childhood abuse at the hands of his father. He then related an incident where he was masturbating in the shower when H.N. came in and asked what he was doing. When asked again about allegations of oral sexual intercourse, Defendant responded "that was so, so, so long ago, he doesn't remember that incident, that he used to drink a lot in the past."

Detective Primeaux had received information about a bump on top of Defendant's penis. H.N. had "disclosed that [Defendant] told her that he had swallowed a Runt banana candy and it got stuck down there." After a hearing, the State obtained an order to take photographs of Defendant's penis. Corporal Tim Soileau took photographs that were introduced at trial as State Exhibits 8 through 11. In the first group of photographs, the bump was "not quite distinctive." Defendant was asked "to start massaging or rubbing his penis to maybe have some blood circulate through it. And as he did that, the lump progressed a little bit higher than what it was earlier." At trial, the State introduced a box of Runt candy for the jury's reference.

Prior to Defendant's arrest, April had informed the sheriff's department that Defendant "had numerous weapons in his residence, handguns, a shotgun, and

swords that were supposed to be extremely sharp." Detectives tried unsuccessfully to contact Defendant twice on January 22 and once on January 23, 2008, before seven officers, including a four-man SWAT team for purposes of officer safety, went to Defendant's home on January 24, 2008. Officers tried twice to summon Defendant using a loud speaker and tried to call his cell phone. Defendant answered the call and was told to come outside with his hands up. After "maybe a minute or two," Defendant did not come outside. Detective Primeaux called Defendant's cell phone a second time; Defendant came to the door and was immediately grabbed and taken to the ground. From the time of the ride from Defendant's home to Detective Primeaux's conversation with Defendant at the Beauregard Parish Sheriff's Office, Defendant never said anything about being ill.

Alyson Meisner Dooley, Case Investigator with Child Protection Services from Beauregard Parish, received a report on January 22, 2008, about two sexual abuse allegations by H.N. against Defendant. The first allegation was that H.N. had touched Defendant's penis. The second allegation was that Defendant had told H.N. "he was going to wash her with a cloth, but that he had put his tongue between her legs instead."

Dooley met with Detective Primeaux and Defendant on January 24, 2008. Defendant denied that H.N. had ever seen or touched his penis. He said he had been in the bathroom once when H.N. walked in; Defendant realized she was there after a second or two and turned away so that H.N. could not see his "private part." Defendant said that H.N. would have never been in the bathroom while he was taking a shower. He denied performing oral sex on H.N., and "[h]e denied ever telling her that he was going to wash her with a cloth and then instead put his tongue between her legs. And he also denied ever telling her to go and get a kitchen knife to cut his penis off because it had grown too big."

6

At first, Defendant "was very gregarious and talkative." About two hours into the interview, around 9:00 p.m., Defendant was told H.N. had identified "a lump on the top of his penis." Defendant seemed "to suddenly fall ill . . . You could see a physical change in his appearance. He became pale, said he didn't feel good, that he had been suffering from pneumonia, hung his head down and started to gag and said that he was really tired because he wasn't used to being—wasn't used to being up that late."

Defendant waived his Fifth Amendment rights and testified at trial. He stated he was involved in H.N.'s toilet training and hygiene during the time he babysat her. When asked whether he had put his tongue on her crotch or made her put her hands on his penis, Defendant responded, "Absolutely not."

Discord regarding H.N. and her younger half-brother around the time of the allegations included H.N. "being hateful towards her brother, by kicking him in the groin whenever she got mad at him . . ." Defendant had no control over April's household because he was not living there. April had threatened H.N. with "kiddy jail," and Defendant backed her up on that. Defendant told H.N. he "had to stand behind her mother's decision." About three or four weeks later, the police came to Defendant's house. Defendant reiterated that he had not done any of the things he was accused of.

On cross-examination, Defendant admitted the possibility that H.N. had seen his penis when he was using the bathroom or drying off in the shower. Defendant was questioned about his reaction when he learned H.N. said he had a bump on his penis. He said that was after the detective had made offensive remarks about April, after Defendant "had said that [he] was not going to talk anymore to him, that this conversation was over." It was apparent to Defendant "that [Detective Primeaux] was not interested in hearing anything but bits and pieces, answers to

7

leading questions in which [Defendant] had no idea–no ability to continue the statement of." Defendant testified that he had told Detective Primeaux he was weak and recovering from pneumonia at the time the detective called him at home on his cell phone. Defendant "knew what was going on" at the interview, [b]ut when you take tepin (sic) hydrate with codeine, you start to fall asleep."

Defendant testified H.N. was making up these allegations, but he had no idea why. He said Brittany and Brooke had told him H.N. had said some things. However, at Defendant's bond reduction hearing, he had said only Brooke, Brittany's twin, had told him. Brittany testified that she never told anyone about what H.N. told her.

Betty Campbell, the mother of Brooke and Brittany, testified that Defendant had a reputation for truthfulness, and "was always good to the kids." She "never heard nothing bad" about Defendant, who was "a father figure" to Brooke and Brittany.

## ASSIGNMENT OF ERROR NUMBER ONE

Defendant alleges the trial court patently erred in failing to withhold the imposition of sentence for twenty-four hours following the denial of his motion for new trial, as required by La.Code Crim.P. art. 873. The record reveals that the trial court did run afoul of the Code of Criminal Procedure. However, the error is harmless. Defendant does not assign as error excessiveness of his sentence, and he does not show, or even allege, any way he was prejudiced by the lack of delay. *See State v. Shepherd*, 02-1006 (La.App. 3 Cir. 3/5/03), 839 So.2d 1103.

## ASSIGNMENT OF ERROR NUMBER TWO

Defendant argues that the trial court erroneously denied his motion to continue the trial despite the alleged untimely receipt of the court's list of priority cases, in violation of *State v. Simpson*, 551 So.2d 1303 (La.1989). Trial was

8

originally set for September 8, 2008. It was refixed for trial on March 2, 2009; that date was continued unopposed at Defendant's request until September 14, 2009. On March 2, 2009, trial was refixed for September 14, 2009. It was later refixed for January 4, 2010, February 8, 2010, May 3, 2010, and September 20, 2010. Jury selection began on September 28, 2010; trial was recessed first until October 4, 2010, and then until October 5, 2010.

The record contains no further motions or orders for continuance. Nevertheless, in a hearing on another matter on September 29, 2010, Defendant's counsel argued that he had already orally moved for a continuance, and his motion was denied. The record does not reflect such a motion or disposition. At that hearing, Defendant's counsel indicated that he was filing a written motion for continuance and supporting memorandum, which argued that he could not prepare for trial of this matter and another matter because of problems with the trial court's priority list. Counsel then proceeded to argue the issue extensively, even though it had not been set for hearing, noting one of his concerns in this matter "was having to try [this] case while [the other] case was over [his] head for Monday." The trial court granted the continuance in the other case and ordered the trial of this case to proceed. The record does not indicate that the motion to continue to which Defendant's counsel referred was ever filed.

A motion to continue "shall be in writing" and "shall be filed at least seven days prior to the commencement of trial." La.Code Crim.P. art. 707. The trial court may grant a written motion to continue at any time "only upon a showing that such motion is in the interest of justice." *Id.* When circumstances occur unexpectedly and defense counsel has insufficient opportunity to prepare a written motion, the requirement of a written motion may be waived. *State v. McGee*, 04-

9

963 (La.App. 5 Cir. 1/11/05), 894 So.2d 398, *writ denied*, 05-593 (La. 5/20/05), 902 So.2d 1050.

The motion defense counsel argued on September 29, 2010, was oral. The prior motion to which counsel referred was likewise oral. Defendant's counsel indicated that he had received the *Simpson* list twelve and one-half days prior to trial, on the Tuesday after the Labor Day holiday. The record reflects that he took no action toward seeking a continuance of this trial during those twelve and one-half days, but rather waited until the second day of jury selection to complain that he had insufficient time to prepare for trial. This case does not present circumstances that occurred unexpectedly nor did it provide counsel an insufficient opportunity to timely prepare a written motion. Again, the record contains no written motion. Accordingly, the trial court did not err in denying Defendant's oral motion to continue the trial on the second day of jury selection.

**ASSIGNMENT OF ERROR NUMBER THREE**

Defendant alleges that the trial court erred by denying his motion for mistrial after trial began with the seating of the jury but before the commencement of evidence and/or for denying his renewed motion for mistrial as to Count 2 of the indictment after conviction. Both of Defendant's motions during trial concerned the allegedly defective indictment. He now argues the "overcharging of Count 1 requires reversal of his conviction on Count 2."

The entire argument is based on the allegedly defective indictment. Count I of the indictment, filed March 6, 2008, reads:

> COUNT 1: AGGRAVATED RAPE
> [DEFENDANT] DID ENGAGE IN ORAL SEXUAL INTERCOURSE WITH TO WIT: H.N., DOB: 3-16-94, A JUVENILE, WITHOUT THE VICTIM'S LAWFUL CONSENT UNDER CIRCUMSTANCES WHEREIN THE VICTIM WAS PREVENTED FROM RESISTING THE ACTS BY THREATS OF GREAT AND IMMEDIATE BODILY HARM, ACCOMPANIED

10

APPARENT POWER OF EXECUTION OCCURRING IN CALCASIEU PARISH.

The indictment alleges that this act occurred "on or about January 1, 1997 to December 31, 2003."

The crime of aggravated rape did not include oral sexual intercourse until an amendment of La.R.S. 14:42, effective August 15, 2001, changed the language of the statute. Acts 2001, No. 301, § 1. In response to the State's pre-trial writ application seeking to include responsive verdicts on the verdict form, this court held, "If the evidence at trial shows the offense occurred prior to August 15, 2001, the trial court shall charge the jury as to the responsive verdicts available at that time" and ordered the trial court "to fully charge the permissible verdicts which are supported by the evidence adduced at trial." *State v. R.W.B.*, an unpublished writ ruling bearing docket number 10-1198 (La.App. 3 Cir. 10/5/10).

After a trial begins, an order of mistrial is mandatory when the indictment contains a defect of substance. La.Code Crim.P. art. 487(A). A defect of substance is one "which will work to the prejudice of the party accused." *State v. Harris*, 478 So.2d 229, 231 (La.App. 3 Cir. 1985), *writ denied*, 481 So.2d 1331 (La.1986) (quoting *City of Baton Rouge v. Norman*, 290 So.2d 865, 870 (La.1974)). In *Harris*, the trial court allowed amendment of a defective indictment after trial began over the defendant's objection. This court held the defendant did not allege or prove prejudice resulting from the defect in the original indictment, he was made aware of the crime charged and the date and time it allegedly occurred, and his rights concerning pre-trial notice and double jeopardy were not compromised. Thus, the defect was one of form, not of substance, and the trial court did not err by allowing the amendment.

11

Here, Defendant alleges prejudice by "the defect and the overcharging of Count 1." He contends that the State proceeded with prosecution of Count 1 despite a lack of evidence to support the charge, and the "other crimes" evidence the jury was allowed to hear was the evidence of the aggravated rape charged in Count 1. Defendant acknowledges his acquittal on Count 1 but nevertheless argues the prosecution of that count somehow influenced his conviction on Count 2, "due to the overall prejudicial effect of the flawed bill of indictment."

The trial court considered the indictment here to be defective because the facts on which the State relied constituted the crime of aggravated rape only for part of the time period alleged by the State in the indictment. The court

> worked [its] way through that to make sure that the crime that [it was] dealing with fit particular time periods. The [c]ourt listened to the evidence and made rulings as [it] went along to insure that the jury would only consider the initially indicted charge of aggravated rape only for a particular time period because of the change in the law.

Evidence of other crimes "is not admissible to prove the character of a person in order to show that he acted in conformity therewith." La.Code Evid. art. 404(B). Evidence of the "other crime" in this case, i.e, aggravated rape, was not offered or admitted as an indication of character. It was offered because aggravated rape was the crime charged in Count 1 of the indictment.

The jury found Defendant not guilty on Count 1. This verdict shows that the jury obviously did not consider the evidence the State presented to be evidence of "other crimes"; through the not guilty verdict, the jury showed it did not consider Defendant to have committed that crime. We, therefore, fail to see how Defendant was prejudiced. Because we find no prejudice resulted, the defect in the indictment was one of form, not of substance; therefore, the trial court did not err in denying Defendant's motion for mistrial.

## ASSIGNMENT OF ERROR NUMBER FOUR

Defendant argues reference to H.N. as "the victim" by the trial court and the State prejudiced him. He contends the reference "presupposes that the fact has been established that the accuser is the victim of the crime at trial, and thus invades the province of the jury." Defendant cites no authority to support this position.

Defendant fails to cite any instance where reference to H.N. as "the victim" caused any prejudice to him or resulted in unfair treatment. The trial court's instructions to the jury told them to disregard any impression he may have given regarding Defendant's guilt or innocence. He explained Defendant was "presumed to be innocent until each element of the crime necessary to constitute his guilt is proven beyond a reasonable doubt." This argument is without merit.

## ASSIGNMENT OF ERROR NUMBER FIVE

Defendant argues prospective juror #316 was improperly dismissed for cause. Such an argument is proper only where "the effect of the ruling is to allow the state to exercise more peremptory challenges than is allowed by law." *State v. Green*, 98-1388, p. 12 (La.App. 3 Cir. 3/31/99), 735 So.2d 723, 731, *writ denied*, 00-2904 (La. 8/24/01), 795 So.2d 323 (citing *State v. Joe*, 28,198 (La.App. 2 Cir. 7/26/96), 678 So.2d 586, *writ denied*, 97-559 (La. 10/31/97), 703 So.2d 16; *State v. Fleeks*, 26,720 (La.App. 2 Cir. 3/1/95), 651 So.2d 370; La.Code Crim.P. art. 800(B)). Here, the State was entitled to twelve peremptory challenges. La.Code Crim.P. art. 799. It exercised only eleven. Thus, even if the prospective juror were improperly excused for cause, his exclusion did not result in allowing the State peremptory challenges to which it was not entitled.

## ASSIGNMENT OF ERROR NUMBER SIX

Defendant contends that he was improperly denied the right to submit impeachment evidence at trial; thus, his rights under the Confrontation Clause of

13

the Sixth Amendment and his due process rights under the Fourteenth Amendment were violated. He complains that he was prevented from submitting evidence to show H.N.'s "motives of chafing at parental restriction of her conduct and society with a particular member of the opposite sex or boys generally, and of what before trial had come full flower as her manifest biological imperative." Defendant argues that he should have been allowed to put on evidence that H.N. had borne two children by the time she testified at trial at age sixteen. He speculates that the jury "was left to wonder whether [he] himself had possibly fathered one or both of them," although the only reference to either child occurred when H.N. testified, during Defendant's cross-examination, that she lived with "her two babies."

Evidence of a victim's past sexual behavior is certainly admissible under certain circumstances. La.Code Evid. art. 412(A). None exist here. Article 412's comment (c) explains that this rule "is not intended to exclude evidence showing bias, interest, or corruption." Defendant contends that he was entitled to put on the evidence to show H.N.'s keen interest in making the allegations: namely, to get him out of the way so that she could behave as she wished.

The evidence Defendant was able to admit showed that H.N. lived with her mother, little brother, two children, and step-father at the time of trial. According to H.N.'s testimony, she had seen television programs talking about child molestation. She believed the father of her older half-brother had been charged with a child-molestation offense. Before H.N. told her friend, Brittany, what Defendant had done, Brittany "told [H.N.] that her dad had done something to her. But then she later said that didn't happen." H.N. believed Defendant and her mother were divorced, but Defendant "was staying in the house sometimes" when her conversation with Brittany took place. H.N. "might have been 12, but probably close to 13" at the time.

14

Around a half a year to a year later, H.N. told her mother and her half-brother that Defendant had done something to her. The next day, H.N.'s mother took her to the sheriff's office to report the incidents. When H.N. was around age thirteen, she and her mother began having disagreements about things she would be allowed or not allowed to do. She was also thirteen when her mother took her to the sheriff's office to talk about what she had told Brittany.

After H.N. talked to Brittany and her mother about what happened with Defendant, H.N.'s mother "caught her" with her boyfriend. H.N.'s mother "would get on to [her] about laying on the couch with him and warning [her] not to do anything." H.N. testified that Defendant never said anything to her about that, and he never played any part in the conversations between H.N. and her mother. H.N.'s mother told her many times, up until around the time she was around age thirteen, that she would put H.N. in juvenile detention if she "didn't straighten up." H.N. testified that she did not make up what she said Defendant did to her because of the threats to be put in "juvie," because of the custody dispute between her mother and Defendant involving her younger half-brother, or so that her younger half-brother could stay with her mother.

The trial court allowed extensive testimony by April, over the State's objection, about details from her divorce proceeding with Defendant. Defense counsel was allowed to discuss papers filed in that proceeding that alleged April committed adultery with a named individual. When the State objected, defense counsel argued "[t]he relevance goes to the motive to make or to assist in the allegations that have been made against [Defendant] in this case." April testified that she filed for divorce from Defendant because they argued all the time, he constantly yelled at H.N., and he and their son got into several arguments. The petition was filed September 12, 2005, and they executed a custody agreement

concerning their son on February 2, 2006. April testified that she and Defendant had no major issues regarding their son's custody after that agreement. H.N. disclosed the alleged abuse by Defendant in the beginning of 2008.

Defendant himself testified about discord in their family regarding both H.N. and his son. He observed H.N. "being hateful towards her brother, by kicking him in the groin whenever she got mad at him, these types of things." Defendant had no control over H.N.'s discipline in early 2008, because he was not living with her, but he did stand behind April's discipline, including the "kiddy jail" that was threatened. He told H.N. he would stand behind her mother's decision on that matter about three or four weeks before he was arrested.

As seen from the foregoing, Defendant put on a great deal of evidence tending to demonstrate the problems H.N. allegedly posed. However, by his own testimony, those problems occurred after he and April had divorced and settled their custody dispute. We find the introduction of evidence establishing the fact that H.N. became sexually active and gave birth to two children after Defendant's arrest is prohibited by Article 412 under these circumstances. The admission of this evidence would not serve the purpose of showing H.N.'s interest in seeing Defendant sent away to prison for reasons other than the crimes of which he stands convicted.

### ASSIGNMENT OF ERROR NUMBER SEVEN

Defendant argues that Louisiana's ten-to-two majority verdict law is federally unconstitutional. La.Code Crim.P. art. 782. Although it is unclear from the record whether this issue was properly preserved for review on appeal, we find no merit to Defendant's argument. The trial court's instructions to the jury stated, "At least ten members of the jury must concur to reach a verdict in this case on each count." Defendant contends that the Supreme Court's decision in *McDonald*

16

*v. City of Chicago, Ill.*, __ U.S. __, 130 S.Ct. 3020 (2010), required a unanimous verdict here; thus, Defendant's conviction must be vacated.

The *McDonald* court, if anything, verified the constitutionality of Article 782. *McDonald* concerns the issue of whether the right to bear arms is incorporated into the concept of due process, not the issue of one's right to a unanimous jury verdict. The case does, however, discuss the applicability of the federal Bill of Rights to the states and notes, "[T]he Court abandoned 'the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights,' stating that it would be 'incongruous' to apply different standards 'depending on whether the claim was asserted in a state or federal court.'" *Id.* at 3035 (citing *Malloy v. Hogan*, 378 U.S. 1, 10-11, 84 S.Ct. 1489, 1495 (1964)).

However, footnote 14 of *McDonald* states:

> There is one exception to this general rule [that Bill of Rights protections are enforceable against the states]. The Court has held that although the Sixth Amendment right to trial by jury requires a unanimous jury verdict in federal criminal trials, it does not require a unanimous jury verdict in state criminal trials. See *Apodaca v. Oregon*, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972); see also *Johnson v. Louisiana*, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972) (holding that the Due Process Clause does not require unanimous jury verdicts in state criminal trials). But that ruling was the result of an unusual division among the Justices, not an endorsement of the two-track approach to incorporation. In *Apodaca*, eight Justices agreed that the Sixth Amendment applies identically to both the Federal Government and the States. See *Johnson*, *supra*, at 395, 92 S.Ct. 1620 (Brennan, J., dissenting). Nonetheless, among those eight, four Justices took the view that the Sixth Amendment does not require unanimous jury verdicts in either federal or state criminal trials, *Apodaca*, 406 U.S., at 406, 92 S.Ct. 1628 (plurality opinion), and four other Justices took the view that the Sixth Amendment requires unanimous jury verdicts in federal and state criminal trials, *id.*, at 414-415, 92 S.Ct. 1628 (Stewart, J., dissenting); *Johnson*, *supra,* at 381-382, 92 S.Ct. 1620 (Douglas, J., dissenting). Justice Powell's concurrence in the judgment broke the tie, and he concluded that the Sixth Amendment requires juror unanimity in federal, but not state, cases. *Apodaca,* therefore, does not undermine the well-established rule that incorporated Bill of Rights protections

17

apply identically to the States and the Federal Government. See *Johnson*, *supra,* at 395-396, 92 S.Ct. 1620 (Brennan, J., dissenting) (footnote omitted) ("In any event, the affirmance must not obscure that the majority of the Court remains of the view that, as in the case of every specific of the Bill of Rights that extends to the States, the Sixth Amendment's jury trial guarantee, however it is to be construed, has identical application against both State and Federal Governments").

*McDonald*, __ U.S. at __, 130 S.Ct. at 3036-36, n.14.

Defendant's counsel even admitted, at the hearing of the motion in arrest of judgment, that "the majority verdict law is being consistently upheld, and that's not going to change until the U.S. Supreme Court grants, cert, and reverses *Appadocca* [sic] *vs. Oregon.*" That has not happened. Thus, based on *Apodaca* and the Court's positive comments on it in *McDonald,* we conclude that Defendant's argument is without merit.

## ASSIGNMENT OF ERROR NUMBER EIGHT

Defendant complains that the trial court erroneously "admitted highly-prejudicial police photographs of the defendant being forced to stretch out his penis while wearing jailhouse orange." He contends admission of the photographs was more prejudicial than probative and violated his due process rights.

H.N. testified Defendant had "a bump" on his penis, and he told her he "swallowed a banana Runt [candy], and it got stuck." The State obtained an order to take photographs in an effort to determine whether any penile abnormality in fact existed. Photographic evidence is generally admissible unless its probative value is outweighed by its prejudicial effect. *State v. Snyder*, 98-1078 (La. 4/14/99), 750 So.2d 832.

*Snyder* involved the admission into evidence of postmortem photographs that the defendant claimed were prejudicially gruesome. Our supreme court held that "[p]ostmortem photographs . . . are admissible to prove corpus delicti and to

18

corroborate other evidence establishing cause of death and location and placement of wounds, as well as to provide positive identification of the victim," and these were "relevant to illustrate the number and location of stab wounds to the victim." *Id.* at 843.

This case presents a similar issue. The photographs, while certainly sensitive, are not gruesome. The photographs were admitted during Detective Primeaux's testimony to corroborate H.N.'s testimony and support her credibility. The trial court was very careful to prohibit Detective Primeaux from testifying about his opinion of what he saw in the photographs. The trial court explained to the jury it could "make [its] own decision about whether something is there or not." The trial court further instructed the jury that people in jail "wear jailhouse orange," and "[t]he fact that person has been arrested, has been charged with a crime or is in jail is not proof that they committed any crime." It also explained that the purpose of showing the jury the photographs was "only for the purpose of [the jury] seeing his penis." We find that the trial court did an exemplary job in providing instruction, and consequently, the jury was able to make its own determinations and freely decide whether it saw anything in the photographs to corroborate H.N.'s testimony. The probative value of the photographs outweighed any prejudicial effect they may have had; thus, Defendant's argument is without merit.

### DECREE

Defendant's conviction is affirmed.

**AFFIRMED**.

19