

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-0264-17

**ARMAUD SEARS, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE NINTH COURT OF APPEALS
### JEFFERSON COUNTY

YEARY, J., delivered the opinion of the Court in which KELLER, P.J., and KEASLER, HERVEY, ALCALA, RICHARDSON, KEEL and WALKER, JJ., joined. KEEL, J., filed a concurring opinion in which WALKER, J., joined. NEWELL, J., concurred in the result.

## O P I N I O N

A jury convicted Appellant of the offense of aggravated robbery and sentenced him to prison for twenty-five years. The Ninth Court of Appeals held that the evidence was legally insufficient to support the aggravating element—use or exhibition of a deadly weapon—but that the evidence was legally sufficient to support the lesser-included offense of robbery, and it reformed the judgment under *Thornton v. State*, 525 S.W.3d 289, 299–300

(Tex. Crim. App. 2014). *Sears v. State*, No. 09-15-00161-CR, 2017 WL 444366, at *9–13 (Tex. App.—Beaumont Jan. 31, 2017) (mem. op., not designated for publication). We granted the State's petition for discretionary review to determine whether the State produced sufficient evidence to prove the greater offense of aggravated robbery. We reverse.

## BACKGROUND

### At Trial

On March 8, 2013, Laura Brown,[1] her two children, and Brown's then-boyfriend, Kadrian Cormier, were at Brown's home in Beaumont. Brown and Cormier spent the early morning hours packing for a trip to Las Vegas when they fell asleep in Brown's bedroom around 4:30 a.m. or 4:45 a.m. They awoke to a loud banging at the back door and heard a voice yelling: "Beaumont police, open the door." As Brown headed down the hallway to investigate, she saw three men in ski masks and black clothes break through the door and enter the house. When she turned back toward her bedroom to get away, Brown did not see Cormier and did not know where he had gone.

According to Brown, she was then grabbed by one of the men, who placed a gun against her head while the other two men headed straight into her bedroom. She was led into the bedroom a few moments later and told to lie on the bed. Brown's daughter was then brought into the bedroom and was told to sit on the bed with her mother. Each had a gun pointed at her head while one of the men held Brown's son at gunpoint and took him around

---

[1] "Laura Brown" is a pseudonym used in the court of appeals' opinion to protect the victim's identity. Accordingly, we do the same in this opinion.

the house, apparently to determine whether anyone else was present. Brown testified that one of the guns used to threaten her and her children was a "long gun," but she could not confirm the type of "long gun" that was used. Eventually, Brown's son joined his mother and sister on the bed, and the three men began searching the room. They immediately looked under the bed and found $3,000 that Brown had withdrawn from an ATM in preparation for her trip to Las Vegas. The men took the money, along with some jewelry on Brown's dresser, and left the house. Brown called 911 soon after.

Cormier did not testify at trial. Instead, Officer Beattie, who spoke with Cormier at the scene, testified to what Cormier told him.[2] According to Beattie, when Cormier awoke, he saw two of the men already inside the house, and he immediately ran into the bathroom. He escaped through the bathroom window and flagged down a red truck that he saw in front of the house. When Cormier got into the truck, he asked to use the driver's cell phone to call 911. The driver declined, claiming that he was using his phone to speak with his mother. However, Cormier heard a male voice speaking through the phone and became suspicious that the driver was involved in the robbery. When Cormier told the driver he wanted to leave

---

[2] Appellant objected to Cormier's statements on the basis of hearsay. *See* TEX. R. EVID. 801 & 802 (a statement made by an out-of-court declarant is inadmissable at trial, subject to some exceptions, if it is offered to prove the truth of the matter asserted). The State filed a pre-trial motion for a finding of forfeiture by wrongdoing, claiming that Appellant "had engaged in wrongful acts that were intended to, and did, procure Cormier's absence at trial." *Sears*, 2017 WL 444366, at *20. The motion was granted and Appellant appealed the trial court's decision granting the motion on the basis that it violated his Sixth Amendment right to confrontation. *Id*. at *18–19. The court of appeals overruled the point of error, holding that the trial court did not abuse its discretion in admitting Cormier's out-of-court statement. *Id*. at *18–23. We are not asked in this case to review the court of appeals' decision on this issue.

the truck, the driver responded, "I bet you do, motherf—er," and refused to let Cormier out. The driver then drove the truck away from Brown's house, forcing Cormier to jump out. Cormier flagged down another vehicle and was able to use the driver's phone to call for help and report the license plate number of the red truck. He returned to Brown's house roughly ten to fifteen minutes after the three intruders left.

Beattie also testified to what Brown told him when he responded to the scene. Most of Beattie's report was consistent with Brown's testimony at trial, including the fact that she and her children all had guns pointed at them individually. However, Beattie's report did not specify whether Brown described any of the guns as a "long gun." Additionally, Beattie testified that Brown claimed the men stole $5,400 from under her bed—not $3,000, as she testified at trial—and that the money was from an income tax refund.

A second Beaumont policeman, Officer Little, also testified at trial. According to Little, he was dispatched to Brown's neighborhood in response to a call about a suspicious truck in the area. He was re-routed to Brown's house when the dispatch changed to a home invasion that occurred about half a block away from the suspicious truck. When Little arrived at the scene, Brown informed him that three men had entered her house, held a "black and big" gun to her head, and "started asking her where the money was." Brown also told Little that she, Cormier, and one of Brown's friends were the only ones who knew of her income tax refund. Little testified that, based on what Brown told him about the break-in, he suspected that someone close to Brown may have been involved in the robbery.

The person who called 911 to report the suspicious truck was Chris Portner, whom the State also called to testify at trial. According to Portner, he was driving home when he saw a red truck, driving ahead of him, come to a sudden stop, reverse towards him, and stop again near a ditch. When he came up to the traffic light, he passed the truck and witnessed three "people" run out of the ditch and get into the truck. Portner testified that "[i]t appeared that what happened was the truck drove past the ditch and had to stop and then went in reverse and was backing up to get to the ditch where they were running out of." He called 911 around 6:00 a.m. to report the suspicious activity and the truck's license plate number. On cross-examination, Portner stated that he did not observe that any of these "people" had an item or weapon in their possession. He also conceded that, had someone been carrying a "long gun like a shotgun or rifle" with them, he likely would have seen it.

The license plate number that Portner reported was the same number Cormier told Beattie belonged to the red truck. A subsequent search of the number revealed that it belonged to a red Toyota Tundra, which had been rented by Crystal Foxall in February 2013. Foxall testified that Appellant had asked her to rent a vehicle for him. She could not confirm whether Appellant was the only person to drive the truck, but she did explain that Appellant had kept the vehicle for some time, recalling that she had to ask Appellant for the truck to have the oil changed. Appellant was found driving the red truck on March 10, 2013—two days after the robbery occurred—and detained by Beaumont police. Later, Cormier identified Appellant in a photo line-up as the driver who refused to help him.

The State also called Detective Lewellyn, who testified about his investigation of the case. During his investigation, Lewellyn met with Brown and was told much of the same information that she testified about, including the fact that a "long gun" was used during the robbery, but Lewellyn could not confirm that Brown told him that all of the intruders had guns. Instead, he could only confirm that "there were at least two guns that were pointed at her and her children." Lewellyn also met with Cormier, Portner, and Foxall; all three told him the same information that they supplied at trial.[3] Significantly, Lewellyn testified to statements Appellant made to him after Appellant was detained by Beaumont police. Appellant denied that he participated in the robbery and denied that he acted as a getaway driver. However, he did admit that he was in the area at the time of the robbery, stating that he was there to meet a girl, and that he was the driver of the truck that Cormier flagged down.

In addition, Lewellyn interviewed Darrell Bendy, an inmate who had given a statement in April of 2013 regarding Appellant's involvement in the robbery. Bendy was called to testify at trial, but he did not admit to giving a statement. He also denied having any knowledge about Appellant or his role in the robbery.[4] Nevertheless, Lewellyn testified

---

[3] Although Cormier didn't testify at trial, the information he conveyed to Lewellyn was the same as the statement he gave to Officer Beattie that was admitted at trial.

[4] The State tried to introduce Bendy's statement into evidence, but could not do so because the State could not authenticate the statement since Bendy denied making it. *See* TEX. R. EVID. 901(a) & (b)(1) (requiring that evidence must be authenticated before it may be admitted and providing one example that would include "[t]estimony that an item is what it is claimed to be").

concerning Bendy's statement that it corroborated Brown's, Cormier's, and Appellant's version of events and that it indicated that Appellant had "confess[ed] to being a party to this aggravated robbery." Although the detective admitted he was unable to identify the three men who broke into Brown's house, he concluded from his investigation that Appellant was involved as a party to the robbery.

The jury was authorized to convict Appellant of aggravated robbery as a principal or as a party. After deliberation, the jury returned a general verdict of guilty and assessed Appellant's punishment at twenty-five years in prison.

## On Appeal

On appeal, Appellant argued, among other things, that the evidence was legally insufficient to support his conviction. In an unpublished opinion, the court of appeals partially agreed with Appellant. It held that the evidence was legally insufficient to support the aggravating element of the offense—that Appellant knew a deadly weapon would be used—but that the evidence was legally sufficient to support a conviction for the lesser-included offense of robbery. *Sears*, 2017 WL 444366, at *9–13. Consequently, the court of appeals reformed the judgment to reflect a conviction of robbery. *Id*. at *10, 13 (citing *Thornton*, 525 S.W.3d at 299–300, for the proposition that courts of appeals may, in certain circumstances, reform a judgment for a lesser-included offense when the evidence is insufficient to support the greater offense for which a defendant was convicted). The court of appeals overruled Appellant's other points of error and remanded the case for a new

punishment hearing. *Id*. at \*23.

We granted the State's petition for discretionary review to determine whether the court of appeals erred in finding the evidence insufficient to support the greater offense of aggravated robbery. The State argues that the court of appeals failed to weigh the combined and cumulative force of the evidence in the light most favorable to the verdict—specifically, the circumstantial evidence suggesting that at least one of the intruders must have exhibited his weapon in front of Appellant before the robbery occurred. We hold that the evidence was legally sufficient to support such an inference and reverse the judgment of the court of appeals.

## APPLICABLE LAW

When a defendant challenges his conviction on the ground that the evidence was legally insufficient, a reviewing court must affirm the conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)). However, "[w]e are not to sit as a thirteenth juror reweighing the evidence or deciding whether *we* believe the evidence established the element in contention beyond a reasonable doubt[.]" *Blankenship v. State*, 780 S.W.2d 198, 207 (Tex. Crim. App. 1988). Instead, "we test the evidence to see if it is at least conclusive enough for a reasonable factfinder to believe based on the evidence that the element is established beyond a reasonable doubt." *Id*. (citing

*Jackson*, 443 U.S. at 318).

A defendant is guilty of robbery if, in the course of committing theft and with the intent to obtain or maintain control over the property, he (1) intentionally, knowingly, or recklessly causes bodily injury or (2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. TEX. PENAL CODE § 29.02(a). The offense may be aggravated if the defendant uses or exhibits a deadly weapon in the course of committing a robbery. TEX. PENAL CODE § 29.03(a)(2). A defendant need not commit the robbery or aggravated robbery himself to be guilty of the offense; it is enough that the defendant intends to promote or assist the commission of the offense and he "solicits, encourages, directs, aids, or attempts to aid" another person to commit it. TEX. PENAL CODE § 7.02(a)(2).

Although the defendant must facilitate or attempt to facilitate the offense in some manner, a defendant "may be convicted only of those crimes for which he had the requisite mental state[,]" and party liability will only extend to those specific offenses the defendant intended to facilitate. *Ex parte Thompson*, 179 S.W.3d 549, 554 (Tex. Crim. App. 2005). To determine whether a defendant had the requisite mental state, "the courts may look to events before, during and after the commission of the offense." *Medellin v. State*, 617 S.W.2d 229, 231 (Tex. Crim. App. 1981). Ultimately, a conviction under the law of parties turns on the defendant's intent to promote *the offense*, which means that, when prosecuting a defendant as a party to aggravated robbery, the State must demonstrate that the defendant intended to promote the full offense, including the aggravating element, before or during the commission

of the offense. *Id.*; *see also Sarmiento v. State*, 93 S.W.3d 566, 570 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) ("[W]here the use of a deadly weapon is an element of the offense, [to convict a defendant for aggravated robbery as a party,] the State automatically carries the burden of proving the defendant knew a weapon would be used or exhibited in the commission of the offense.").

It is undisputed that there is little evidence to support Appellant's conviction for aggravated robbery as a principal, and the State raises no issue with the court of appeals' opinion with respect to this holding.[5] *See Sears*, 2017 WL 444366, at *8 (disposing the issue of Appellant's liability as a principal in one sentence). The State argues only that the court of appeals erred when it held that the evidence was insufficient to support Appellant's conviction for *aggravated* robbery under the law of parties. Therefore, the sole issue we resolve today is whether the evidence was sufficient to support a rational jury finding that Appellant knew before or during the robbery that a deadly weapon was or would be used by the men when they broke into Brown's home.[6]

## ANALYSIS

The court of appeals first concluded that the State failed to present evidence that might

---

[5] According to the court of appeals, "[t]he State's theory from voir dire examination to its final argument was that [Appellant] was the getaway driver for the men who robbed Brown's home and that [Appellant's] guilt depended upon the law of parties." *Sears*, 2017 WL 444366, at *8 n.4. The State has not deviated from this position in its petition for discretionary review.

[6] The identity of the three men is unknown in this case, and no charges were brought against any person as a co-defendant. Detective Lewellyn tried to identify the intruders, but he did not obtain enough information "to the point where I can file a case[.]"

support the jury's finding that Appellant was aware a deadly weapon would be, or was used

or exhibited during the robbery. *Id*. at *9. The court of appeals summarized the evidence on

these questions as follows:

> The undisputed evidence presented at trial shows that while the masked men were committing the robbery inside Brown's home, Sears was in a red Toyota Tundra in front of or in the vicinity of Brown's house. There is no evidence that Sears entered Brown's house at any time while the robbery was being committed. The jury heard testimony that Kadrian Cormier escaped through a bathroom window during the robbery and flagged down a vehicle, which happened to be the red Toyota Tundra that Sears was driving. Although there is evidence that Cormier tried to explain to Sears "what was going on and that he needed to call to the police to get help," there is no evidence that Cormier told Sears that the intruders inside the house had guns or other weapons. Further, there was no evidence that Sears could see into the home through the windows or otherwise to see what was happening inside.
> . . . While there is evidence that a witness saw three men in dark clothing emerge from a ditch close to Brown's house and jump into a red truck bearing the same license plate as the truck that Cormier had seen Sears driving several minutes earlier, the witness testified that he could not see if the men had anything in their hands. Thus, even if the jury reasonably believed that the three men the witness saw getting into the truck were the same men who had robbed Brown and that Sears was the one who was driving the red truck when the three men jumped into it, the witness's testimony does not establish that the three men were visibly displaying any firearms when they got into the truck or that after getting into the truck, they showed Sears their firearms or made Sears aware that they had used or exhibited firearms during the commission of the robbery. Further, when Sears was arrested two days after the robbery driving the same red truck, there is no evidence that any firearms were located inside the truck.

*Id*. at *9–10.

What *is* clear from the record, and uncontested by the parties, is that the evidence was

more than sufficient for a jury to believe that Appellant participated in the robbery as a

getaway driver. Indeed, the court of appeals held as much when it reformed the judgment for

aggravated robbery to reflect the lesser-included offense of robbery. *Sears*, 2017 WL 444366, at \*10–13 (reviewing the evidence at trial and reforming the judgment for a lesser-included offense pursuant to *Thornton v. State*). Two witnesses linked Appellant as the driver of the red truck in front of Brown's house: Cormier, who identified Appellant as the driver in a photo line-up; and Foxall, who testified that she rented the red truck for Appellant days before the robbery. Appellant himself even admitted to Detective Lewellyn that he was the driver of the red truck that Cormier jumped into. And two witnesses linked the red truck to the robbery specifically: Cormier, who told Officer Beattie and Detective Lewellyn that the driver of the red truck seemed connected to the robbery because he refused to give up his cell phone for Cormier to call 911, acted hostile to Cormier when he asked to leave the car ("I bet you do, mother---er"), and drove Cormier away from the house; and Portner, who testified that he saw the red truck stop and pick up three people, all with their faces obscured, just a few minutes after the robbery. Further, Appellant admitted to Detective Lewellyn that he was in the area the morning that the robbery occurred, stating that he was there to meet a girl. We agree with the court of appeals that this evidence was sufficient to find that Appellant acted as the getaway driver and was, therefore, a party at least to the lesser offense of robbery.

We disagree, however, that the jury could not have reasonably concluded from this same evidence that Appellant was guilty as a party to *aggravated* robbery. The court of appeals' analysis focused on what the evidence *did not* show, such as any indication that

Appellant was in a position to see the guns when the intruders were in the house or when they entered the truck from the ditch, or that Cormier told Appellant any details about the robbery before Cormier leapt out of the truck. *Id*. at \*9–10. However, it is "the combined and cumulative force of *all* the evidence" in the record that must be considered in a sufficiency review, *Hooper v. State*, 214 S.W.3d 9, 17 (Tex. Crim. App. 2007) (emphasis added), and, looking at the cumulative force of the evidence in the entire record of this case, we believe the jury's finding that Appellant knew a deadly weapon was being or would be used during the commission of the robbery was supported by sufficient evidence.

First, the jury could have inferred that Appellant drove the three men to Brown's house to commit the robbery and would therefore have been able to see at least the "long gun" at some point before the robbery occurred. The robbery took place in the early morning hours—Brown testified she fell asleep around 5:00 a.m. and Portner's 911 call was made around 6:00 a.m. Cormier told Officer Beattie that, when he woke up and saw the intruders, he *immediately* leapt out of the bathroom window and flagged down the red truck *in front of* Brown's house. These circumstances place Appellant, as the driver of the eventual getaway car, right outside the crime scene at the time the robbery was taking place (though he claimed to be there to meet a girl). A rational jury could also infer that the intruders would not have used public transportation at that early hour (especially toting a "long gun") to convey themselves to the crime scene. All of the robbers arrived together, all of them carried guns (including the "long gun") at the crime scene, and they all left together and escaped in

the getaway car in which Appellant had been lingering during the course of the offense. A rational jury could readily infer from these circumstances that Appellant actually drove the robbers to the crime scene, was an integral part of the scheme to commit the robbery at Brown's home and, therefore, would have been aware of the manner in which the intruders planned to commit the offense—including the use of guns. This was sufficient evidence for a rational jury to conclude that Appellant, at least while driving the men to Brown's home, would have become aware that a gun would be used during the commission of the robbery. *See Hooper*, 214 S.W.3d at 16 (noting that inference stacking is not inappropriate in a *Jackson* sufficiency analysis "as long as each inference is supported by the evidence presented at trial. . . . [and not] based on mere speculation").[7]

Second, in addition to this substantial circumstantial evidence, the jury also heard Detective Lewellyn's account of the inmate, Bendy's, claim that Appellant had confessed specifically "to being a party to this aggravated robbery." While this constitutes hearsay on at least one level, Appellant did not object to it at trial. Unobjected-to hearsay "may not be denied value merely because it is hearsay[,]" TEX. R. EVID. 802, and it must be given

---

[7] These facts are also distinguishable from *Wyatt v. State*, 367 S.W.3d 337 (Tex. App.—Houston [14th Dist.] 2012, pet. dism'd), a case upon which the court of appeals placed heavy reliance in its opinion. While committing a bank robbery, Wyatt's single accomplice brandished a gun, which, while not described, was apparently a small enough gun that it could be easily concealed. *Id.* at 338. Wyatt himself was not present during the robbery but was found an hour-and-a-half after the commission of the robbery with half of the stolen money in his car. *Id.* at 339. Without expressing any opinion on the propriety of the court of appeals opinion in that case, we note that the facts in *Wyatt* are readily distinguishable. The facts of this case readily support an inference that Appellant was more than a general participant and would have been specifically aware that guns were used during the robbery.

whatever probative value it may have in a legal sufficiency analysis. *See Poindexter v. State*, 153 S.W.3d 402, 406 (Tex. Crim. App. 2005) ("[O]nce the trier of fact has weighed the probative value of unobjected-to hearsay in its fact-finding process, an appellate court cannot deny that evidence probative value or ignore it in its review of the sufficiency of the evidence."). So, Lewellyn's testimony was direct evidence of Appellant's guilt. And even if it were not, the jury could rationally have taken Lewellyn's testimony as corroboration of the circumstantial evidence that Appellant knew at the time the robbery was taking place that his accomplices were using guns to perpetrate the offense.

## CONCLUSION

For the reasons stated above, we hold that the jury could rationally have concluded that Appellant was aware that guns would be used in the commission of the robbery, and the evidence was therefore legally sufficient to support Appellant's conviction for the greater offense of aggravated robbery. Accordingly, we reverse the court of appeals' judgment reforming Appellant's conviction for the lesser-included offense of robbery and reinstate the judgment of the trial court.


DELIVERED:      September 12, 2018
DO NOT PUBLISH